**Riley S. WALLS, Appellant**

v.

**UNITED STATES, Appellee.**

No. 97–CF–1778.

District of Columbia Court of Appeals.

Argued May 13, 1999.

Decided May 31, 2001.

Deborah A. Persico, Washington, DC, appointed by the court, for appellant.

L. Jackson Thomas, II, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and J. Patrick Rowan, Assistant United States Attorneys, were on the brief, for appellee.

1. D.C.Code §§ 22–2401 and 22–3202 (1996).

2. D.C.Code §§ 22–501 and 22–3202 (1996).

3. D.C.Code § 22–3204(b) (1996).

4. D.C.Code § 22–3204(a) (1996).

Before TERRY and REID, Associate Judges and MACK, Senior Judge.

TERRY, Associate Judge:

At approximately 3:00 a.m. on August 9, 1992, Riley Walls and his friend Micah Bryan encountered Ramon Cherry and Jesse Moore on the front steps of an apartment building. After an exchange of words, Walls pulled out a nine-millimeter handgun and opened fire. Cherry was shot in the foot but managed to escape with his life. Moore was not so lucky; he was shot in the back and died at the scene. Walls was later arrested and charged with first-degree murder while armed,[1] assault with intent to kill while armed,[2] possession of a firearm during a crime of violence,[3] and carrying a pistol without a license (CPWL).[4] After two mistrials, each of which resulted from a hung jury, Walls was tried a third time and convicted of all the offenses charged except CPWL.[5]

On appeal Walls raises three claims of error. First, he contends that the trial court erred in precluding him from impeaching Micah Bryan, who testified for the government, with a prior juvenile adjudication for second-degree murder. Second, Walls asserts that he was denied the effective assistance of counsel in his third trial because his attorney failed to call a witness, Andrew Morris, who had testified at the first trial that he saw two men who did not match the description of Walls and Bryan fleeing from the scene immediately after the shooting. Finally, Walls challenges the sufficiency of the evidence that he had a specific intent to kill Ramon Cherry. We reject each of these arguments and affirm all the convictions.

5. At his first trial, the court granted Walls' motion for judgment of acquittal on that count.

## I

### A. *The Government's Evidence*

Micah Bryan, who was a close friend of Walls in 1992, testified that he and Walls arrived at 811 Bellevue Street, S.E., early in the morning of August 9, 1992, intending to spend the night at the apartment of Bryan's mother. Walls was carrying a "Tech 9" semi-automatic handgun in the front of his pants. He parked his white station wagon in the alley behind the apartment building. On their way up the front steps, they saw sixteen-year-old Ramon Cherry and fourteen-year-old Jesse Moore coming down the steps toward them. Cherry and Moore knew Bryan but did not recognize Walls. Cherry thus inquired as to the reason for Walls' presence in the neighborhood, and Moore asked Bryan, "What's up with you bringing your man around here?" Walls grew upset at these questions and retorted that it was none of their business what he was doing there. The four young men continued to exchange words as they passed each other on the steps. According to Bryan, Moore did not appear to have a weapon, nor did he make any threats or otherwise show signs of aggression.

Moore and Cherry then turned and started to walk away,[6] but Walls came back down the steps and moved toward them, drawing his gun. When Cherry and Moore saw that Walls had a gun, they started to run. Suddenly Walls fired several shots. Cherry managed to escape into the stairwell of an adjacent building, but Moore was hit in the back and fell to the ground, face down, in the alley. As Bryan and Walls got back into Walls' car, Walls uttered an obscenity and exclaimed, "They shouldn't disrespect me." The two

headed for a nearby gas station to buy some sodas, then continued to drive around for a while until Walls dropped Bryan off at his house.

A few weeks later, Cherry ran into Bryan at a convenience store and told him, "This is [messed] up, man, you know what I'm saying, you know your man shot my man. . . . You didn't do nothing about it or nothing like that."

Ramon Cherry testified that he and Moore were coming down the front steps of the apartment building on the night of the shooting while Walls and Bryan were headed up the steps. According to Cherry, Bryan had already reached the top of the steps by the time Walls got out of his car. Moore asked Bryan why Walls was "looking at us the way he was . . . he must don't know where he be at." Cherry, seeing that Walls had a gun tucked in his waistband, told Moore to "come on." Moore took about three steps away from Walls, then turned back around to face him. When Walls started shooting, Cherry ran into the building next door and up two flights of stairs. As he ran, he heard about ten or twelve shots. One of those shots struck his right foot.

A short time later, Cherry returned to the alley and saw Moore's motionless body lying on the ground. After walking a little farther down the alley, he met a friend named Donald Butler. Cherry and Butler ran through the apartment complex to Southern Avenue, stopping once to ask a neighbor to call the police. They eventually flagged down a passing patrol car, which drove them back to the scene of the shooting.

Although he knew Walls by name, Cherry did not at first disclose the identity of

---

6. As he walked away, Moore said to Cherry that he was "rolling out" and was not "tripping out on that."

Moore's killer to the police because he wanted to get revenge by killing Walls himself. Instead, he gave the police a false description of two persons who he said were responsible for the shooting. One he described as a twenty-two-year-old man, six feet tall, weighing 160 pounds, with a medium complexion, wearing green pants and a black shirt. The other, he said, was a thirty-five-year-old man, about five feet four inches tall, whom he described as "scruffy." Cherry told the police that these two men shot Moore and then fled in a blue car. A few minutes later, the police brought to the ambulance where Cherry was waiting two men who resembled the descriptions he had given and asked him if they were involved in the shooting. He said that they were not.

Donald Butler witnessed the events leading up to the shooting from a hill on the opposite side of a parking lot near the apartment building.[7] He heard and saw Moore arguing with one of the men, and then heard Cherry tell Moore to "come on." Butler turned away briefly, but looked up again when he heard four gunshots. He testified that he saw flames coming from the muzzle of the shooter's gun. After the shooting, Butler ran down Chesapeake Street and met Cherry in an alley. He noticed that Cherry was limping and had blood on his shoe. Butler also said that the two men whom the police brought back to the scene did not resemble the two who had been involved in the shooting.

On the day after the shooting, Walls asked Carlos Scott whether Scott had heard that he had "busted somebody." Scott testified that he understood the word "busted" to mean shot.

On November 29, 1993, more than a year after the shooting, Special Agent Charles Regini of the Federal Bureau of Investigation asked Cherry to come to the United States Attorney's Office to talk about the case. During their conversation Cherry named Walls as Moore's killer and selected his picture from an array of photographs. Cherry also identified Walls in court as the man who shot Moore. Cherry testified that, before speaking with Agent Regini, he had told both Donald Butler and Jesse Mahoney, Moore's father, that Walls was the gunman.[8] He also corroborated Bryan's story about their encounter in a convenience store a few weeks after the shooting, when Cherry confronted Bryan and accused Bryan and Walls of killing Moore.

Agent Regini testified that when he interviewed Ramon Cherry in November 1993, Cherry initially claimed not to know the identity of Moore's killer. However, after being confronted with photographs of Moore's dead body, Cherry picked Walls' picture out of an array of nine photos. On cross-examination, Regini admitted that he had warned Cherry that he could be charged with perjury if his testimony before the grand jury was inconsistent with what he had told other people about the murder.

Moore was shot once in the left side of his back; two shell casings were recovered at the scene. Special Agent Marguerite Warner, an FBI firearms expert, testified that the shells were fired from an M 11 nine-millimeter pistol, which was "consistent in all identifiable physical characteristics with a Tech 9 pistol." Agent Warner also stated that a chemical examination revealed the presence of vaporous lead

---

7. Butler admitted that he was under the influence of marijuana at the time.

8. In his testimony Jesse Mahoney confirmed that Cherry told him that Riley Walls had killed his son.

next to the bullet hole in Moore's shirt, which indicated, according to Warner, that Moore was shot from a distance of no more than two and a half feet.

## B. *The Defense Evidence*

Metropolitan Police Officer Rodney Williams testified that in the early morning hours of August 9, 1992, he and his partner were flagged down in the 800 block of Southern Avenue by Ramon Cherry and another man. Cherry gave him a description of the two men involved in the shooting, describing one as a young man, age twenty-two, weighing 160 pounds, with brown eyes, black hair, and a medium complexion, wearing green pants and a black shirt, and the other as a thirty-five-year-old man about five feet four inches tall. Additionally, Williams remembered receiving some information about the description of the shooter from "some firefighter or ... paramedics that were on the scene," but he could not recall whether that information was consistent with the description given by Cherry.

## II

### A. *The Exclusion of Micah Bryan's Juvenile Record*

Walls contends that the trial court erred by precluding him from cross-examining Micah Bryan about his juvenile adjudication for second-degree murder. The exclusion of this evidence, Walls maintains, violated his Sixth Amendment right to confront adverse witnesses and, indirectly, his right to present a defense. He claims that the use of Bryan's juvenile record was critical to his defense because "[w]ithout effective impeachment evidence, the jury could merely have determined that the discrepancies [between the testimony of Bryan and that of Cherry] were minor, given the time of night, the short time period of events, and the notion that, generally, no two people recall the details of events exactly the same."

When this court is faced with a claim that cross-examination was unduly restricted, our standard of review "will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof, as well as the other circumstances that prevailed at trial." *Springer v. United States,* 388 A.2d 846, 856 (D.C.1978); *accord, e.g., (Reginald) Smith v. United States,* 392 A.2d 990, 991 (D.C.1978). Our first step is to determine "whether the trial court has permitted sufficient cross-examination to comport with the requirements of the Sixth Amendment right to confrontation." *Springer,* 388 A.2d at 856. Walls concedes in his brief that the trial court did not totally curtail cross-examination, but argues that the trial court's exclusion of the evidence of Bryan's juvenile adjudication was an abuse of discretion. He asks us nevertheless to apply the harmless error standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), applicable to constitutional errors, because in his view the trial court's ruling "effectively shattered the heart of [the] defense theory—that Bryan's testimony and prior statements to the police were not credible and that his prior statements about the shooting were biased because of his continued supervision status in the juvenile case."

We decline to apply *Chapman* because we do not agree that the trial court's curtailment of defense counsel's cross-examination of Bryan amounted to constitutional error. "[T]he Sixth Amendment does not require the trial court to permit impeachment with juvenile adjudications unless they can be used to estab-

lish bias, not merely to challenge general credibility." *Tabron v. United States,* 410 A.2d 209, 212 (D.C.1979) (*"Tabron I"*). Thus "evidence of a prior conviction usually is inadmissible [to impeach general credibility] if the conviction resulted from a juvenile adjudication." *Smith,* 392 A.2d at 993 (citation omitted).

We recognize, of course, that a defendant's Sixth Amendment right to confront adverse witnesses with evidence of bias must prevail over "the policy of protecting the anonymity of juvenile offenders." *Id.* at 992 (citing *Davis v. Alaska,* 415 U.S. 308, 320, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). In the instant case, however, it is not entirely clear from the record that defense counsel was seeking to establish that Bryan was biased, rather than simply that his testimony was generally incredible. When counsel stated his intention to impeach Bryan with his juvenile adjudication, the trial court asked if he meant to use it to attack his "testimonial credibility," and counsel answered, "Yes." During the ensuing discussion, counsel twice more referred to the impact of Bryan's juvenile adjudication on the jury's assessment of Bryan's credibility, but he did not speak in terms of bias. Other comments by defense counsel, however, could arguably be read as asserting that Bryan was biased, in that he had lied "to get [himself] out of trouble and out of jail." Assuming *arguendo* that the bias claim was adequately preserved for appellate review, Walls' contention on appeal, as stated in his reply brief, is that the fact that Bryan was still under court supervision when first interviewed by the police would show that "his prior statements about the shooting were biased." Thus, the argument goes, the evidence of the juvenile adjudication would impeach Bryan's assertion that the reason he did not come forward initially was that he wanted to protect the shooter.

The flaw in this argument is that Walls does not explain how this impeachment evidence would have shown that Bryan's *trial* testimony was biased in any way. As we explained in *Tabron I,* "in referring to the use of prior convictions or adjudications to impeach for bias, we mean an effort to show that a witness *currently* has a relationship to the court system ... which arguably provides a basis for that witness to curry favor with the government, perhaps even by lying." 410 A.2d at 212 (citations omitted; emphasis added). In this case, however, as the trial court pointed out, Bryan's commitment as a juvenile had long since come to an end by the time he took the stand in Walls' trial. Thus we do not see how Bryan's prior juvenile record could have been used to establish the kind of bias to which *Davis v. Alaska* and *Tabron I* refer, namely, *testimonial* bias. We hold accordingly that the *Davis* rule was not violated, and that there was no constitutional error.

The only remaining question is whether the trial court abused its discretion in restricting the cross-examination of Bryan. *See Smith,* 392 A.2d at 993. We have held that it was error to deny a defendant the right to impeach a witness' general credibility with a prior juvenile adjudication when the "disclosure of the prior adjudication[ ] 'might have affected the outcome'" of the trial. *Tabron v. United States,* 444 A.2d 942, 946 (D.C. 1982) (*"Tabron II"*) (citation omitted). The trial court's task, and ultimately ours as well, is to determine "whether a reasonable jury could have arrived at a different outcome, not what the trial court itself would have concluded as trier." *Id.*

We are satisfied that the disclosure of Bryan's juvenile record would not have had an appreciable effect on the outcome

of the trial because the jury had already heard ample evidence undermining Bryan's credibility, much of it provided in Bryan's own testimony. On direct examination, Bryan admitted that he had twice been convicted of possession of narcotics with intent to distribute (once in Maryland and once in the District of Columbia) and had also been convicted of possession of a handgun. He conceded, in addition, that when he was initially interviewed by the police and the FBI about the murder of Jesse Moore, he falsely stated that he knew nothing about it. He explained that he had lied to the FBI at first because he did not want to say anything to implicate Walls, who was his friend. He also said that he was afraid of Walls because Walls had told him not to let anyone know what he had done.

It was not until after his Maryland conviction (for possession with intent to distribute) that Bryan changed his story and identified Walls as the gunman. Bryan stated that he agreed to testify after entering into an agreement on February 15, 1994, while he was still serving time in Maryland. Under this agreement, the prosecutor promised to seek a reduction in his Maryland sentence of eight years in exchange for Bryan's testimony against Walls. By the time of Walls' third trial, Bryan had been released on parole after serving three years of his Maryland sentence. He insisted that his testimony had nothing to do with his being paroled, although he was still hoping for a reduction in sentence. On cross-examination, however, Bryan admitted that his sentence in Maryland, which was originally ordered to run consecutively to an earlier sentence imposed in the District of Columbia, had been changed to run concurrently with that sentence after he agreed to cooperate with the government. Bryan maintained nevertheless that he had been unaware of the favorable change.

Walls argues that, without the addition of Bryan's juvenile adjudication, his impeachment of Bryan was insufficient to affect the jury's assessment of Bryan's credibility. According to Walls, disclosure to the jury of Bryan's juvenile record, along with the fact that he was still under court supervision when he initially withheld information from the police, would have undermined Bryan's assertion that his only reason for not coming forward earlier was to protect Walls and would have negated the jury's impression that Bryan's criminal record was relatively minor.

■ Even assuming, for the sake of argument, that Bryan's juvenile record might have had the effect that Walls supposes, it does not necessarily follow that the trial court's decision to exclude it was erroneous. Trial judges are afforded "considerable discretion to control cross-examination, and may restrict the subject of inquiry if the danger of unfair prejudicial effect of the evidence outweighs its probative value." *Smith*, 392 A.2d at 991 (citation omitted). On the record before us, we discern no abuse of that discretion, primarily because the probative value of the excluded evidence was slight. Even if the jury believed that Bryan's reason for initially lying to the police was to protect his own interests, rather than to shield his friend Walls, there was other abundant impeaching evidence before the jury. Bryan, moreover, was not the only eyewitness to the shooting. Ramon Cherry provided significant evidence of Walls' guilt. His testimony, to be sure, was also impeached, but it was entitled to such weight as the jury chose to give it. Bryan's testimony was essentially consistent with that of Cherry. The jury's assessment of Bryan's credibility at trial, therefore, would not have been significantly affected

by the admission of his juvenile record, and thus it is extremely unlikely that the outcome of the trial would have been any different. We find no abuse of discretion and hence no basis for reversal.

### B. The Failure to Call Andrew Morris as a Witness

Andrew Morris, a paramedic with the District of Columbia Fire Department, lived in an apartment on Bellevue Street, a short distance from the scene of the crime. At Walls' first trial in March 1995, Morris testified that when he arrived home on August 9, 1992, he saw two men run out of the alley where Jesse Moore's body would soon be found, get into a blue Pontiac, and drive away.[9] He did not hear any shots or see anything in the men's hands. He described the two men as being in their mid- to upper twenties and said he recognized one of them as someone who was "considered an area thief." After the men drove away, two security guards asked Morris if he had seen anything. When he answered affirmatively, they took him to the scene of the murder. Morris testified that the two men who were picked up by the police were the same two that he had seen running away after the shooting.

▓▓▓ Walls' first trial ended in a hung jury. Morris was not called as a witness

in the third trial,[10] which resulted in a conviction. Walls now claims that his attorney's decision not to call Morris to testify at his third trial amounted to ineffective assistance.[11]

Several weeks after the third trial ended, but before sentencing, the court allowed Walls' retained counsel to withdraw from the case and appointed a new attorney for sentencing. That attorney, however, advised the court in a motion that Walls was "dissatisfied with his approach to this matter, with his advice and explanations, and wants counsel to withdraw immediately and the court to appoint another attorney to represent him." The court granted this motion and appointed a third attorney for sentencing. A few weeks later—still before sentencing, which had been postponed—that third attorney[12] filed on Walls' behalf a purported "motion to vacate sentence" under D.C.Code § 23–110 (1996), even though there was as yet no sentence to vacate. The government opposed the motion as premature, citing the statutory language itself,[13] and argued that in any event the motion was without merit.

When the case came on for sentencing, the court—quite correctly—agreed with the government that the motion was pre-

---

**9.** Morris also testified that the sound of gunfire was not unusual in the neighborhood, and that the normal reaction of people who lived in the area was to run away when they heard it.

**10.** Although the record is silent on the matter, the parties represent to us that Morris did not testify at the second trial, which, like the first, ended in a hung jury.

**11.** In his brief, in passing, Walls also faults his trial counsel for failing to call Priscilla Bowling as a witness. The brief contains no substantive discussion of this claim, however, and appellate counsel expressly abandoned it at oral argument.

**12.** Walls is now represented by a fourth attorney on appeal.

**13.** Section 23–110(a) provides that "[a] prisoner in custody *under sentence of the Superior Court*" (emphasis added) may file a motion to vacate that sentence on grounds set forth in the statute. *See also Junior v. United States,* 634 A.2d 411 (D.C.1993), in which this court drew a "distinction between Rule 33 motions [for new trial] and § 23–110 motions on the basis of whether the defendant has been sentenced." *Id.* at 417 (citations omitted).

mature and therefore could not be considered under section 23–110. It therefore deferred ruling on the motion until after it had actually imposed sentence "because if I simply [deny it as premature] now, inevitably I'll have to deal with it later." It then imposed consecutive sentences of imprisonment totaling forty-five years to life. After doing so, the court denied Walls' section 23–110 motion (which by then was properly before the court) without an evidentiary hearing, "for the reasons well stated by [the] government ... in its written opposition to the motion," expressly accepting the government's argument—which the government essentially repeats in this court—that counsel's decision not to call Morris as a witness in the third trial was a "wise tactical decision."[14]

 In order to prevail on his claim of ineffective assistance of counsel, Walls must show that his attorney's "representation fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Our "scrutiny of counsel's performance [is] highly deferential," and we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052.

Walls contends that "Morris clearly had relevant information about the events surrounding the shooting" which contradicted the accounts given by Bryan and Cherry. The only contradiction Walls actually identifies, however, is between Morris' testimony that the two men escaped in a blue car, which matched the report that Cherry first gave to the police on the night of the murder, and Cherry's subsequent disavowal of that story at trial. Walls claims that Morris' testimony would have undermined the credibility of Cherry's trial testimony by corroborating Cherry's prior statements.

Given that Morris' description of the two men he saw running from the area matched, in some respects, the description Cherry initially gave to the police, Morris' testimony could have raised some doubt as to which of Cherry's stories to believe. Thus it is theoretically possible that a jury could have found that the two men seen by Morris and described by Cherry were actually the real shooters[15] and that Cherry and Bryan, for some unexplained reason, had decided to concoct a story falsely implicating Walls in the murder.

The government argues that the decision not to call Morris in Walls' third trial was a reasonable tactical decision because, under the standard for determining the admissibility of evidence of a third-party perpetrator, *see Winfield v. United States,* 676 A.2d 1, 2–4 (D.C.1996) (en banc), Morris' testimony was only marginally relevant and might not even have been admissible.

---

14. Other specific claims of ineffective assistance were advanced in Walls' motion filed in the trial court, but the only one urged on appeal is the one relating to Andrew Morris. We deem the others to have been abandoned.

15. Donald Butler, on the other hand, testified that the two men whom the police brought back to the scene of the crime did not resemble the two who had been involved in the shooting. We note that Butler was an actual eyewitness to the murder, whereas Morris was not.

Walls responds that *Winfield* and related cases are inapplicable here because the purpose of Morris' testimony was not to raise the possibility that the two men seen running from the alley were involved in the shooting, but merely to attack the credibility of Bryan and Cherry.

Because Walls expressly disclaims any intention to use Morris' testimony as support for a third-party perpetrator defense, we do not analyze his attorney's decision under *Winfield*. Assessing Morris' testimony solely with respect to its potential effect on the credibility of Bryan and Cherry, we conclude that it would have been of such minimal benefit to Walls' case that his attorney's tactical decision to forego the use of it was not unreasonable. *See (Willie) Smith v. United States*, 454 A.2d 822, 825 (D.C.1983) ("the decision to call witnesses is a judgment 'left almost exclusively to counsel'") (citation omitted). Since Walls has not shown that the outcome of the trial "would have been different" if Morris had testified, *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, we reject his claim of ineffective assistance of counsel.

### C. *Sufficiency of the Evidence of Intent to Kill*

Finally, Walls challenges his conviction of assault with intent to kill on the ground that the government failed to prove that he specifically intended to kill Ramon Cherry. Applying the familiar standard of review for claims of evidentiary insufficiency, we are easily convinced that "there was sufficient evidence from which a reasonable juror could fairly conclude guilt beyond a reasonable doubt." *McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986) (citations omitted); *accord, e.g., Ruffin v. United States*, 642 A.2d 1288, 1291 (D.C.1994).

Under the concurrent intent doctrine, a specific intent to kill each individual may be imputed to a defendant who fires multiple shots at two or more persons at close range. *See, e.g., Ruffin*, 642 A.2d at 1298 (defendant "unloosed a hail of bullets" at one person and wounded him, but another person in the "direct line of fire" was killed, and a third was wounded; in these circumstances the evidence permitted a finding of "concurrent intent to kill everyone in the path of the bullets"); *Gray v. United States*, 585 A.2d 164, 165 (D.C. 1991) (firing three shots at close range in the direction of three children was sufficient to prove a specific intent to kill each of them); *Fletcher v. United States*, 335 A.2d 248, 251 n. 5 (D.C.1975) (firing at a group of police officers at close range supported a finding of specific intent to kill each officer). We see no material difference between these cases and the case at bar. We hold accordingly that the evidence in this case permitted the jury to find that, by firing in the direction of both Moore and Cherry, Walls had an intent to kill everyone in the "zone of danger" which he thereby created. *Ruffin*, 642 A.2d at 1298. "Although the evidence arguably does not exclude every hypothesis inconsistent with intent to kill"—Walls might conceivably have intended only to kill Moore—"this does not invalidate the jury's verdict." *Gray*, 585 A.2d at 165 (citation omitted).

### III

The judgment of conviction is

*Affirmed.*

MACK, Senior Judge, dissenting:

Sometimes, in the practice of criminal law, bizarre factual circumstances make it very difficult to apply settled legal principles. In this murder case, I am left with the disquieting thought that we are in no

position to conclude that the trial court's curtailment of the cross-examination of a pivotal government witness about his own juvenile adjudication for murder did not result in a violation of the Sixth Amendment to the Constitution.

Here, we have no problem with legal principles thanks to *Tabron I & II. See Tabron v. United States,* 410 A.2d 209 (D.C.1979) (*Tabron I*), *appeal after remand,* 444 A.2d 942 (D.C.1982) (*Tabron II* ). We can agree, for example, that the government's failure to disclose (or the trial court's refusal to permit cross-examination of) the juvenile criminal records of witnesses for impeachment purposes, may or may not require a reversal of a defendant's conviction. In making such determination, we consider such factors as whether the juvenile record is sought to show bias or merely general credibility, the extent of the curtailment of cross-examination, and any motive of the witness to curry favor (even by lying) with the government in order to avoid prosecution for the same crime. *See Tabron I, supra,* 410 A.2d at 212–13; *Tabron II, supra,* 444 A.2d at 943–44. We know, moreover, that in order to justify a harmless error ruling, it must be clear beyond a reasonable doubt that *either* (1) the defendant would have been convicted without the curtailment, *or* (2) the restricted line of inquiry would not have weakened the impact of the witness's testimony. *See Tabron II, supra,* 444 A.2d at 944 (quoting *Springer v. United States,* 388 A.2d 846, 856 (D.C.1978)). I repeat that these are separate tests.

As to the facts, we know that in the year 1992, a young teenager (Jesse Moore) was shot to death. Appellant Walls was ar- rested for this murder in 1994. He was tried in 1995 and again in 1996. Both trials resulted in hung juries. This instant appeal is from a conviction obtained in 1997.

While awaiting jury selection in this 1997 trial, a conscientious court (who had presided at one of the previous trials) consulted counsel as to their respective positions with respect to matters which conceivably might prejudice jurors and, thus, the outcome of this third trial. The court refused the prosecutor's request for a *voir dire* question as to whether a juror might have "strong feelings" about the fact that a government witness (*i.e.,* Micah Bryan, who was then incarcerated in Maryland) had made a deal with prosecutors in this case. The court also adhered to its ruling in the previous trial that Micah Bryan's earlier juvenile murder conviction could not be used for impeachment purposes.

As the trial proceeded, the government relied upon the testimony of Micah Bryan. Bryan, a one-time close friend of Walls, testified that on the night of the murder, he had arrived on the scene with Walls and that Walls had concealed a gun in his pants. He testified that Walls was the killer of Moore. He admitted that he did not tell the law enforcement officers this on the night of the murder. He admitted that he identified Walls as the killer only after he himself had been convicted of drug and possessory crimes in Maryland and was seeking a reduction in sentence.[1]

On this record, arguably, I find it difficult to conclude, in this appeal (by Walls from a conviction of murder) that the error in curtailing the cross-examination of Bryan (the key witness against Walls),

---

1. The government also called one Ramon Cherry as a witness. Cherry was fourteen years old at the time of the murder and twenty-one years old at the time of this third trial and, like Bryan, had existing felony and other charges pending in Maryland. He testified that he did not identify Walls as the killer on the fatal night because he "wanted to get some revenge." He wanted to kill Walls himself.

about his own adjudication for murder, was not one of constitutional magnitude. From a purely commonsensical viewpoint, I would think that the "outcome of trial" test of *Tabron II*, 444 A.2d at 944, for harmless error would be impossible to apply here where previous trials involving the same key witness had ended in mistrials.[2]

Turning, therefore, to the second test for harmless error under *Tabron II*, 444 A.2d at 944, it is clear that the restricted line of inquiry concerning Bryan's adjudication for murder would have weakened the impact of his testimony. On the night when young Jesse Moore was murdered, this witness was no stranger to murder; he had killed as a youngster. At the time, he was still under court supervision for his juvenile murder conviction. He arrived on the murder scene with Walls shortly before the shots rang out; he was the only witness in a position to see who actually fired the gun. Indeed, he was, by all accounts, a key witness. Had the jury known of this witness' juvenile adjudication for murder, it is reasonable to assume that it would have put the whole case in a "different light."[3] As a single error, this curtailment, when considered along with the fact that Bryan was no stranger to lying and had every motive to curry favor with the respective jurisdictions of this

area, would undermine confidence in the verdict.

I respectfully dissent.

---

2. Moreover, if we embrace an "outcome of trial" test, the "strategy" of trial counsel—not to call Andrew Morris—at this third trial could conceivably have resulted in a Sixth Amendment violation. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Mack v. United States*, 570 A.2d 777 (D.C.1990). I disagree with the majority that the potential effect of Morris' testimony on the credibility of Bryan and Cherry would have been of minimal value to Walls and, thus, was a "wise tactical decision."

3. As the Supreme Court has stated in the context of *Brady* violations, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a constitutional error is demonstrated by "showing that the [undisclosed] favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The curtailed inquiry into Bryan's juvenile murder conviction, though not a *Brady* violation as in *Kyles*, nonetheless put this case in such a "different light" as to amount to constitutional error.