*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-929

MARQUES AN'RICO JOHNSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-22713-11)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued May 20, 2015                              Decided June 18, 2015)

*Richard S. Stolker* for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time, and *Elizabeth Trosman*, *John P. Mannarino*, and *Jonathan Kravis*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, and FISHER and THOMPSON, *Associate Judges*.

FISHER, *Associate Judge*:  A jury convicted appellant Marques Johnson of one count of aggravated assault while armed,[1] two counts of assault with a

---

[1] D.C. Code §§ 22-404.01 (a), -4502 (a) (2001).

dangerous weapon,[2] two counts of possession of a firearm during a crime of violence,[3] and one count of carrying a dangerous weapon.[4] He appeals, contending that the trial court erred by (1) refusing to compel the government to allow his expert to independently test a firearm, (2) preventing him from impeaching the victim with juvenile adjudications, (3) giving an improper instruction for the crime of aggravated assault, and (4) allowing the government's expert witness on DNA testing to present a misleading slide presentation to the jury. We affirm, but remand to the trial court because three of appellant's convictions merge.

## I.    Background

According to evidence at trial, on November 17, 2011, Timothy Conrad and Danisha Keener went to an apartment building located at 1420 R Street in Northwest Washington, D.C. A group of six men, including appellant, was in the lobby when they arrived.

---

[2] D.C. Code § 22-402 (2001).

[3] D.C. Code § 22-4504 (b) (2001).

[4] D.C. Code § 22-4504 (a) (2001).

When Conrad and Keener left the building, the men followed them out. Appellant then took out a gun and fired at Conrad multiple times in quick succession. Conrad was taken to a hospital and treated for seven gunshot wounds. Police recovered seven expended shell casings at the scene of the shooting, all of which were labeled "WIN .380 auto."

After shooting Conrad, appellant fled into the building to Paulette Miles's apartment and spent fifteen to twenty minutes alone in one of the bedrooms. Later that day, police officers recovered a black, semi-automatic, 9-millimeter handgun from that bedroom. The gun was loaded with ten bullets labeled "WIN .380 auto," and the safety was off. The day after the shooting, appellant told his girlfriend that he had shot somebody on R Street seven or eight times.

At trial, the government called an expert witness on DNA analysis who testified that there was a mix of DNA on the trigger of the 9-millimeter handgun, but that the "major male DNA profile" of the mix matched appellant's DNA. The government also called an expert witness in firearms and toolmark identification, Jonathan Pope. Pope testified that he could not determine whether the seven .380 cartridges found outside the apartment building on R Street had been fired from the 9-millimeter handgun, but that the gun was capable of firing .380 bullets and that

he had successfully test-fired the weapon twice using such ammunition. Pope did note that after he test-fired the first round of ammunition, the shell casing did not eject from the gun, and he had to pull the slide back and then close it to eject the spent shell casing and chamber the next round. Doing so took one second.

Appellant called his own expert witness on firearms and toolmark examination, Dr. William Bruchey, who testified that it was "highly unlikely" that a 9-millimeter handgun could shoot seven .380 bullets in rapid succession. He opined that there were three potential outcomes of using .380 ammunition in a 9-millimeter gun: (1) the gun would not fire; (2) the gun would fire one round but would not eject the expended shell casing, preventing the next round of ammunition from automatically loading; or (3) the shell casing would not fully eject and the gun would jam.

## II.    Independent Testing of the Firearm

The government's key witness testified that she saw appellant shoot Conrad multiple times in quick succession. At trial, appellant argued that this could not have happened with the handgun the police recovered because that weapon could not have fired .380 ammunition several times in a row. He now contends that he

was prevented from proving his theory because the government refused to allow his expert to independently test-fire the handgun, in violation of Super. Ct. Crim. R. 16.

On February 12, 2012, appellant served a general discovery request on the prosecution for, among other things, the opportunity to inspect, copy, and test any guns material to his defense. He did not follow up on that request until April 18, 2013, five days before the trial began. On that day, appellant's trial counsel served a formal Rule 16 request on the government, asking for access to the 9-millimeter handgun so that his expert, Dr. William Bruchey, could test its ability to fire .380 ammunition several times in quick succession.

The parties appeared in court on April 18 to discuss pretrial matters, including the government's motion to exclude Dr. Bruchey's testimony because appellant had not disclosed the basis of his expert opinions. Dr. Bruchey was in the District that day to look at two bullets and bullet casings expended during the government's test-firing of the weapon. He had already inspected the other ballistics evidence. The government explained that he was barred from using the laboratory's equipment to examine the evidence, *see* D.C. Code § 5-1501.09 (2012 Repl.), but agreed to retrieve the evidence from the lab so that Dr. Bruchey could

examine it at the courthouse. Appellant's counsel said that looking at the evidence in the courthouse might be problematic because Dr. Bruchey might need a microscope for a proper examination, but that she would work out that issue with him. The parties did not seriously discuss a plan for Dr. Bruchey to test-fire the handgun.

On April 24, the day after jury selection, the parties informed the court that on April 18 Dr. Bruchey had been unable to properly examine the bullets and casings used in the government's test-firing because he had not brought a microscope. After discussing some options, including mailing the evidence to Dr. Bruchey, the trial court asked defense counsel, "[D]o you want a continuance? We can let the jury go. I haven't sworn them in. But if you want to proceed today, I'm going to swear them in and that's going to be it. And you're just going to have to deal with the evidence." Appellant's counsel asked for the court's indulgence, had a discussion off the record, and then declined the offer of a continuance. She then said she would work on getting Dr. Bruchey access to the evidence "within the confines of the court." She did not renew her request to test-fire the handgun.

On April 26, mid-trial, defense counsel reported to the court that Dr. Bruchey could not bring his microscope from Maryland to the District of

Columbia to examine the evidence. The trial judge said that she could do nothing about that because they were now in the middle of trial. She suggested that Dr. Bruchey rent a microscope to examine the evidence. Defense counsel again did not renew her request for the opportunity to test-fire the handgun. Dr. Bruchey did not view the evidence used in the government's test-fire, nor did he test-fire the weapon.

The correct interpretation and application of Rule 16 is a legal question we review *de novo*. *Jenkins v. United States*, 75 A.3d 174, 195 (D.C. 2013). Section (a)(1)(C) of that rule requires the government to allow a defendant, upon request, to inspect any tangible object that is in the government's possession if it is material to the preparation of the defense. If a party fails to comply with the discovery obligations of the rule, "the court may order such party to permit the discovery or inspection [of the evidence], grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other orders as it deems just under the circumstances." Super. Ct. Crim. R. 16 (d)(2). The trial court's decision whether to sanction a party for a Rule 16 violation, and its choice of a sanction, are reviewed for abuse of discretion. *See Austin v. United States*, 64 A.3d 413, 424 (D.C. 2013).

Even assuming, on this tangled record, that appellant preserved the discovery issue he raises on appeal, *see Thorne v. United States*, 582 A.2d 964, 965 (D.C. 1990) ("A party who neglects to seek a ruling on his motion fails to preserve the issue for appeal."), we conclude that there was no Rule 16 violation. The government did not prevent Dr. Bruchey from examining the evidence. Once appellant requested access, the prosecution took reasonable steps to retrieve the evidence from the laboratory and make it available for viewing at the courthouse. Dr. Bruchey was unable, for whatever reason, to bring his own microscope or rent one, and was barred from using the government laboratory's equipment by D.C. Code § 5-1501.09. Moreover, the court offered to continue the trial so the parties could develop a solution. Appellant's counsel asked for the court's indulgence, had a discussion off the record, and then refused that offer. Assuming for the sake of argument that the government did not fully comply with Rule 16, the court, when faced with these circumstances, did not abuse its discretion by failing to sanction the government.

### III.    Impeachment With Juvenile Adjudications

Timothy Conrad, the victim, was twenty-two when he testified at trial. Appellant's counsel used a prior adult conviction for possession of a controlled

substance with the intent to distribute to impeach Conrad's general credibility and a pending charge for carrying a pistol without a license as evidence of his motivation to curry favor with the prosecution. Appellant contends that the trial court erred when preventing his trial counsel from using several juvenile adjudications to further impeach Conrad on cross-examination.

When a defendant claims that his right to cross-examination was improperly restricted, our standard of review depends on "'whether the trial court has permitted sufficient cross-examination to comport with the requirements of the Sixth Amendment right to confrontation.'" *Walls v. United States*, 773 A.2d 424, 429 (D.C. 2001) (quoting *Springer v. United States*, 388 A.2d 846, 856 (D.C. 1978)). If the court "wholly deprived the defendant of any opportunity to cross-examine a witness or present evidence concerning bias or a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt . . . ." *Clark v. United States*, 639 A.2d 76, 81 (D.C. 1993).

In this case, appellant had ample opportunity to cross-examine Conrad and present evidence suggesting his bias. Appellant's trial counsel used Conrad's prior drug conviction to impeach his general credibility, and used his pending gun charge as evidence of bias. The only cross-examination the trial court limited was

appellant's ability to use Conrad's juvenile adjudications for impeachment. However, "'[t]he Sixth Amendment does not require the trial court to permit impeachment with juvenile adjudications unless they can be used to establish bias, not merely to challenge general credibility.'" *Walls*, 773 A.2d at 429-30 (quoting *Tabron v. United States*, 410 A.2d 209, 212 (D.C. 1979)).

Conrad's juvenile adjudications were not relevant to demonstrate a motive to curry favor with the government because any supervision stemming from those adjudications had ended before his testimony. When pressed by the court, appellant's trial counsel could not explain how the juvenile adjudications would establish that Conrad was biased. Appellant has also failed to give any such explanation on appeal. We therefore conclude that the trial court's limitation of Conrad's cross-examination did not violate the Sixth Amendment and review only for abuse of discretion. *See Parker v. United States*, 586 A.2d 720, 722 (D.C. 1991).

Appellant had ample opportunity to impeach Conrad's general credibility with his prior drug conviction. Even if it were allowed,[5] any impeachment of

---

[5] Appellant has not challenged the continuing validity of our line of cases outlining when the use of juvenile adjudications for impeachment must be allowed.

(continued…)

general credibility with his juvenile adjudications would have been cumulative. Moreover, Conrad's testimony was not central to the government's case—he testified that he did not recognize anyone in the lobby of the apartment building before the shooting and did not see who shot him. In some respects, Conrad's testimony was detrimental to the government's case because it contradicted portions of the testimony of Danisha Keener, the prosecution's main witness to the shooting. We therefore conclude that preventing appellant from using Conrad's juvenile adjudications to impeach him was not an abuse of discretion. *See Parker*, 586 A.2d at 723 (no abuse of discretion where judge allowed some cross-examination on the witness's bias and defendant made no proffer, when asked, explaining how the questions that were excluded would have been probative of bias).

## IV. Jury Instructions for Aggravated Assault

Appellant next contends that the trial court gave incorrect instructions to the jury on the *mens rea* component of aggravated assault. Because he did not object

---

(…continued)
*See, e.g.*, *Walls*, 773 A.2d at 429-30; *Tabron*, 410 A.2d at 212-13; *Smith v. United States*, 392 A.2d 990, 992-93 (D.C. 1978). Under the circumstances of this case, there is no need to reconsider those decisions, even if we, as a panel of the court, were free to do so. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

on this ground at trial, we review only for plain error. *Graham v. United States*, 12 A.3d 1159, 1167-68 (D.C. 2011).[6] Under this standard, "appellant first must show (1) error, (2) that is plain, and (3) that affected appellant's substantial rights. Even if all three of these conditions are met, this court will not reverse unless (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010) (internal quotation marks omitted).

The statute describes alternative mental states for the crime: (1) "knowingly or purposefully caus[ing] serious bodily injury to another person"; or (2) "[u]nder circumstances manifesting extreme indifference to human life, . . . intentionally or knowingly engag[ing] in conduct which creates a grave risk of serious bodily injury to another person . . . ." D.C. Code § 22-404.01. The court instructed the jury that the crime of aggravated assault required that appellant either, "A, intended to cause serious bodily injury to Timothy Conrad, or B, knew that serious bodily injury to Timothy Conrad would result from his conduct, or C, was aware

---

[6] At trial, appellant did object to the aggravated-assault instruction, contending that the court should only read the first portion of the instruction on *mens rea* because the other two parts were "redundant and repetitive." However, that objection was not precise enough to preserve the specific issue that he now raises on appeal. *See Williams v. United States*, 858 A.2d 984, 991-92 (D.C. 2004).

that his conduct created an extreme risk of serious bodily injury to Timothy Conrad, but engaged in that conduct nonetheless." Appellant contends that the jury instructions given in this case improperly left out the requirement that the assault take place "under circumstances manifesting extreme indifference to human life." We are inclined to agree.

The government contends there was no error because the instruction given to the jury follows the model jury instruction, which was revised in 2012 to reflect this court's reasoning in *Perry v. United States*, 36 A.3d 799 (D.C. 2011). *See* Criminal Jury Instructions for the District of Columbia, No. 4.103 cmt. (5th ed. rev. 2013). In *Perry*, Judge Ruiz, writing the lead opinion, said that subsection (a)(1) of the aggravated-assault statute requires that the actor intend to cause serious bodily injury, while subsection (a)(2) requires "a different type of mental element—gross recklessness—as shown by 'intentionally or knowingly' engaging in conduct that, in fact, 'creates a grave risk of serious bodily injury' . . . ." 36 A.3d at 816. Judge Farrell, in a concurring opinion, said that the *mens rea* requirement in subsection (a)(2) "is substantively indistinguishable from the minimum state of mind required for conviction of second-degree murder . . . ." *Id.* at 823. Because "malice" is defined as a subjective awareness that one's conduct creates an extreme risk of death or serious bodily harm, *see Comber v.*

*United States*, 584 A.2d 26, 39 (D.C. 1990), the committee revising D.C.'s model jury instructions chose to remove the language "extreme indifference to human life" from the previous pattern instruction and replace it with "was aware that his/her conduct created an extreme risk of serious bodily injury . . . but engaged in that conduct nonetheless." Criminal Jury Instructions for the District of Columbia, No. 4.103.

Careful attention to the statute and a close reading of the opinions in *Perry* lead us to question the committee's choice. The statutory provision relating to "grave risk" clearly states that the person's actions must be "[u]nder circumstances manifesting extreme indifference to *human life*." D.C. Code § 22-404.01 (a)(2) (emphasis added). Creating an extreme risk of serious bodily injury does not necessarily manifest "extreme indifference to human life." Judge Ruiz's opinion in *Perry* duly noted that there must not only be "gross recklessness" as shown by intentionally and knowingly engaging in conduct that creates a grave risk of serious bodily injury, but also that the defendant must do so "under circumstances manifesting extreme indifference to human life." *Perry*, 36 A.3d at 817 (internal quotation marks omitted). Judge Farrell also stated that subsection (a)(2) of the statute requires that the defendant "'intentionally or knowingly' engaged in conduct that in fact created 'a grave risk of serious bodily injury,' *and he did so*

*with* 'extreme indifference to human life.'" *Id.* at 823 (quoting D.C. Code § 22-404.01 (a)(2)) (emphasis added).

However, assuming for the sake of this appeal that it was clear or obvious that this portion of the instruction was erroneous, appellant has failed to show how it affected his substantial rights. According to the evidence at trial, Timothy Conrad was shot seven times at close range. The doctor who treated Conrad said he lost forty to fifty percent of his circulating blood volume by the time he entered the operating room, and would have died absent medical treatment. The circumstances of the shooting powerfully demonstrate a violation of subsection (a)(1)—a knowing or purposeful effort to cause serious bodily injury. "Gross recklessness," the mental state coupled with "extreme indifference to human life," did not come into play.

Moreover, appellant contended at trial that he was not the shooter. He did not argue that the person who shot Conrad had not committed aggravated assault. He has therefore failed to show that there was a reasonable probability that the wording of the instruction materially impacted the jury's verdict. *See Kidd v. United States*, 940 A.2d 118, 128 (D.C. 2007) (on plain-error review, incorrect jury

instruction was not reversible error because there was no reasonable probability that it had a prejudicial impact on the outcome of the trial).

## V.    Expert Witness Slide Presentation on DNA

Appellant contends that the government's expert should not have been allowed to use a demonstrative aid (a slide show presentation) to help explain DNA testing to the jury.  A demonstrative aid can be used "if it is sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact," but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  *Sheffield v. United States*, 111 A.3d 611, 625 (D.C. 2015) (internal quotation marks omitted).  "[W]e review a trial court's decision to admit or exclude demonstrative evidence for abuse of discretion."  *Lloyd v. United States*, 64 A.3d 405, 409 (D.C. 2013).

The slide show contained information about the characteristics of DNA, how it is collected and tested, and how test results are analyzed.  Appellant contends that it was misleading because it did not discuss false positives, failed to explain that some people leave more DNA on objects than others, lacked sufficient

information regarding error rates of DNA testing, and did not address why appellant's DNA was found on the handgun's trigger but not the handgrip.

The trial court, however, found that the slide show would be helpful to the jury and was not misleading. The court also noted that any issues with DNA testing that were not addressed in the slide show could be brought up in cross-examination, and appellant's trial counsel focused on those topics when cross-examining the government's expert. The court also gave an instruction before the slide show was displayed to the jury, as suggested by this court in *Lloyd*, *see* 64 A.3d at 410, explaining that the slide show was being used for demonstrative purposes and stating, "[I]f there's any discrepancy between the evidence that was admitted and the demonstrative exhibits, . . . you should consider only the evidence that's been admitted in your deliberations." Under these circumstances, the trial court's decision to allow the government to use the slide show was not an abuse of discretion.

## VI. Merger

Finally, appellant contends that three of his convictions merge. The government concedes, and we agree, that appellant's convictions for assault with a

dangerous weapon ("ADW") merge with his conviction for aggravated assault while armed, and his two PFCV convictions merge into one because their predicate offenses merge.  *See Robinson v. United States*, 50 A.3d 508, 532-33 (D.C. 2012).

## VII.  Conclusion

We affirm the convictions, except that we remand for the trial court to vacate appellant's two convictions for ADW and the attendant conviction for PFCV.  Because the sentences for those convictions were to be served concurrently with appellant's remaining convictions, there is no need for re-sentencing.  *See Carter v. United States*, 531 A.2d 956, 964 (D.C. 1987), *abrogated on other grounds by McCrae v. United States*, 980 A.2d 1082 (D.C. 2009).

*It is so ordered.*