Timothy B. LLOYD, Appellant

v.

UNITED STATES, Appellee.

No. 10–CF–1507.

District of Columbia Court of Appeals.

Argued June 26, 2012.

Decided Jan. 24, 2013.

Alec Karakatsanis, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

L. Jackson Thomas, II, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, Roy W. McLeese, III, Assistant United States Attorney at the time the brief was filed, and Sharon K. Donovan, Assistant United States Attorney, were on the brief, for appellee.

Before THOMPSON and OBERLY, Associate Judges, and TERRY, Senior Judge.

TERRY, Senior Judge:

After a jury trial, appellant was convicted of first-degree cruelty to children.[1] On appeal, he argues (1) that the trial court abused its discretion by permitting the jury to see an illustration of a fist punching a child's liver, and (2) that the trial court plainly erred when it allowed the prosecutor to question him about whether two other witnesses had fabricated their testimony against him. We agree with appellant that the illustration should not have been shown to the jury without a cautionary instruction, but we hold that any error was harmless. We also agree that the prosecutor's questioning (which

---

1. D.C.Code § 22–1101(a) (2001).

elicited no objection from defense counsel) was clearly improper, under long-established case law, but in the context of this case it was not so prejudicial that the court's failure to correct it *sua sponte* amounted to plain error. We therefore affirm appellant's conviction.

I

Shortly after 2:00 p.m. on December 16, 2009, appellant called the Naval District Dispatch Center because he was concerned about two-year-old A.M., who was temporarily staying in his home.[2] Within minutes, medical personnel arrived at appellant's home at Bolling Air Force Base.[3] As they entered, they found A.M. lying on his back on the living room floor; his eyes "were beginning to roll." When Sergeant Kimberly Herrera, one of the medical technicians, asked what had happened, appellant told her that he found A.M. in that state when he returned from another part of the house, where he had gone to get a clean diaper for A.M. Appellant said that he thought A.M. might have had "a seizure."[4]

The paramedics found that A.M.'s respiration and heart rate were well below normal, so they decided to take him immediately to the hospital. Upon his arrival at the base medical center, he was unconscious and in critical condition. One of the doctors who treated him, Dr. Bruce Klein, testified that A.M. had "numerous bruises ... to the right side of [his] face ... around his [left] eye, to his anterior abdomen, his flanks posteriorly, his upper left thighs and adjacent pelvis," unreactive pupils, and symptoms of a severe brain injury. Further examinations, including a CT scan, revealed that A.M. had "a large subdural hematoma with brain shift." His liver function tests were "markedly abnormal," and there was retinal hemorrhaging in his right eye. He had suffered a displaced left clavicle fracture, an uncommon injury for such a small child. He was taken immediately to the operating room for emergency surgery, and thereafter he remained in the hospital for almost a month, followed by three weeks at a rehabilitation center. Dr. Klein concluded that A.M.'s injuries were "non-accidental" and that they were inconsistent with a fall "down a few stairs" a day or two earlier, as appellant had described to the police.[5]

Prior to trial, appellant moved *in limine* to prevent the government from introducing into evidence Government Exhibit 64, which depicted a cross-section of a child's torso and a fist making blunt-force contact with the liver. The prosecutor said that the image was being offered to "show how

---

**2.** Appellant's wife was A.M.'s godmother. She and A.M.'s mother were cousins and had grown up in the same household in New Jersey. In late November 2009 A.M.'s mother had gotten married, and appellant and his wife had agreed to care for A.M. for "a week or two" thereafter. They drove to New Jersey, picked him up, and brought him back to the District of Columbia. At that time A.M. was "happy" and appeared to be in good health.

**3.** Appellant's wife was a corporal in the Marine Corps. She and appellant lived in military housing at the Air Force Base. While she worked during the day at the Washington Navy Yard, appellant stayed home and took care of A.M.

**4.** No one else was in the house. Appellant's wife had come home for lunch, and when she left to go back to work, A.M. was dressed in a T-shirt and a diaper and was sitting on the sofa watching television.

**5.** Dr. Peter Stephens, a forensic pathologist, testified as an expert for the defense. He said that he could not tell whether A.M.'s injuries were intentionally inflicted or accidental, and that they could have resulted from a fall down three or four stairs, or possibly from a countertop to the floor.

the liver [could] be injured." She asserted that the image was "relevant" because Dr. Cindy Christian, one of the government's expert witnesses, would testify that A.M. had "liver bruising" which was the result of "blunt force trauma, such as a punch, kick, things like that." The prosecutor added that she did not intend to offer the image into evidence, but instead simply wanted to show it to the jury. Defense counsel argued that it was "inflammatory to even show it," but the court rejected that argument, stating, "I don't agree with that. As long as she's going to be talking about this ... to illustrate her testimony, I'll rule on it finally during the trial. But I think that's an appropriate use of it."

Later, during her direct examination, Dr. Christian described the bruising of A.M.'s liver as the result of a "blunt impact injury to the abdomen." At that point, the government showed Exhibit 64 to the witness without objection. Dr. Christian described the exhibit as "a diagram from [a] ... collection of [a] kind of blunt impact injury to the abdomen of a child and how it can cause liver injury."

> So you're looking at a cross-section ... as if [you] took a knife and sliced me in half and kind of opened me up and showed you what we're doing.

Dr. Christian added:

> [I]n young children, the liver sits a little lower down. It's not quite as protected by the ribs as it is in an older child or an adult. So if you punch a child in the belly or kick a child in the belly, or there's blunt impact in the belly, you can cause injury to that liver ... bruising ... bleeding ... [and] tears in the liver.

With respect to A.M.'s injuries, Dr. Christian said:

> He had multiple bruises to his chest, to his abdomen, to his flanks, to his groin area.... Whether those were punches or kicks, I can't say. I was not there. There was no specific imprint mark. But they are all evidence of impact. That liver contusion is evidence of blunt impact into the abdomen.[6]

Defense counsel, during his cross-examination of Dr. Christian, showed her the exhibit again (and showed it again later to the defense expert, Dr. Stephens) and discussed the liver more generally. During that testimony, Dr. Christian agreed that the illustration was "just an example of ... something that could have caused blunt trauma to the liver."

## II

Appellant, citing our decisions in *Hammond v. United States*, 501 A.2d 796 (D.C. 1985), and *Burleson v. United States*, 306 A.2d 659 (D.C.1973), argues that the government's use of Exhibit 64 created a "mental tendency" in the jurors to prove what it portrayed, even though the exhibit was entirely speculative. Both parties agreed that the child had suffered a blunt impact injury. The central question, appellant contends, was about the cause of the injury, and the illustration of the use of a fist to cause injury to the liver purported to show only one possible answer.

The government counters that the exhibit was admissible (even though it was not actually admitted into evidence) because it illustrated the testimony of its expert that very young children were par-

---

6. According to Dr. Christian, the injuries to A.M. were the result of "substantial force." It was "extraordinarily uncommon," she said, for a "simple fall" to cause that much injury to a child, especially considering the "constellation" of injuries. In her opinion, A.M.'s injuries were "clearly the result of child abuse." She was also skeptical that the injuries could have been caused by a fall down the stairs a few days earlier, concluding instead that they had occurred "just before he was brought to the hospital."

ticularly susceptible to blunt impact injuries. Distinguishing the *Burleson* case, the government argues that in this case, unlike *Burleson*, there was nothing remote or conjectural about the exhibit with respect to its connection to appellant or the charged crime. The government adds that any "mental tendency" to believe that a punch caused the injury was tempered by Dr. Christian's testimony that a punch was simply "just an example of ... something that could have caused blunt trauma to the liver."

Before turning to the merits, we must first address our standard of review. Appellant contends that the trial court abused its discretion by permitting the exhibit to be shown to the witness and seen by the jury. He asserts that his counsel objected, unsuccessfully, to the prosecutor's use of the exhibit, and that the court reserved only its decision on whether the exhibit would be admitted into evidence. The government maintains, however, that the court's ruling was not definitive, and therefore that appellant did not adequately preserve the issue for anything other than plain error review on appeal. Appellant's other present challenges to the exhibit, the government contends, which include arguments that the exhibit was irrelevant, that there was "no evidence" to support what it depicted, and that the court's failure to give a limiting instruction about its use engendered even more prejudice, should also be reviewed for plain error.

 As we have said in prior cases, if a trial court makes the basis for its ruling conditional and the condition fails to materialize during trial, a party is required to alert the court to its absence and object. *See, e.g., Anderson v. United States,* 857 A.2d 451, 459 (D.C.2004). Here, however, we cannot say that appellant was required to object as to the absence of any specific condition. The government's use of the

exhibit during trial was fully consistent with the discussion that took place before Dr. Christian took the stand. Defense counsel claimed that it would be inflammatory; the government responded that it would merely illustrate the testimony of the expert witness and would not be inflammatory, and that it would not actually be introduced into evidence and given to the jury. Once it was shown to the witness at trial, the only conceivable basis for an objection would have been, again, its inflammatory nature. For this reason, defense counsel's objection did not need to be renewed during the doctor's testimony. *See, e.g., Wilkins v. United States,* 582 A.2d 939, 942 n. 7 (D.C.1990) ("An objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received" (citations omitted)). On the other hand, we review the other grounds on which appellant now challenges the use of the exhibit only for plain error because appellant did not object on any of those other grounds. *See, e.g., Timms v. United States,* 25 A.3d 29, 36 (D.C.2011) ("Objections must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he is being asked to rule." (citation omitted)).

 As to the substantive legal question, we review a trial court's decision to admit or exclude demonstrative evidence for abuse of discretion. *See Williams v. United States,* 641 A.2d 479, 483 (D.C. 1994); *Taylor v. United States,* 601 A.2d 1060, 1066–1067 (D.C.1991). The court may permit the introduction or use of a demonstrative aid "if it is 'sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact.' " *Brown v. United States,* 464 A.2d 120, 123 (D.C.1983) (quoting MCCORMICK ON EVIDENCE § 212, at 528 (2d ed.1972)); *see Punch v. United States,* 377

A.2d 1353, 1358 (D.C.1977) (defining relevant evidence), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). Yet, as Professor McCormick cautions, "[p]robative dangers may exist because exhibits of this kind can be more misleading than helpful due to inaccuracies, variations of scale, distortion of perspective, etc." MCCORMICK ON EVIDENCE § 214, at 375 (6th ed.2006). When discussing the use of photographs as demonstrative evidence, we have made clear that, in order to avoid prejudice, the jury must be made aware of any differences between what the photograph depicts and what actually occurred. *See Hammond*, 501 A.2d at 798 ("The crucial requirement is that the jury adequately be made aware of any variances between a photograph and reality.").

■ We agree with appellant that, under *Hammond* and similar cases, the trial court should have given the jury a cautionary instruction about the exhibit, making clear that the blunt force in question did not necessarily have to be a punch with a fist; nevertheless, we are satisfied that its failure to do so was harmless. Although the illustration depicting a fist was shown to the jury, it was certainly no more inflammatory than the several photographs showing the actual injuries to A.M., to which appellant did not object. Moreover, given all of the injuries sustained by A.M., the use of an illustration as to only one of them, the trauma to the liver, was minor in context. This is especially true when we consider that A.M. had significantly more serious injuries to his head, including a (potentially fatal) subdural hematoma. Indeed, the bulk of the questioning about the child's injuries concerned the trauma to the head, and whether or not a fall could have caused the number of injuries that A.M. suffered. In addition, any implication that a punch might have been the source of the blunt force was diminished by the testimony of Dr. Christian that the injury could have been the result of "punches or kicks," and that a punch was "just an example" of something that could cause that type of trauma to the liver. This testimony was reinforced by appellant's own expert witness, Dr. Stephens, who stated that the injury could have been caused by some other type of mishap, such as falling down three or four stairs. Finally, nothing in the record suggests that there was any effort by the government to use the exhibit to mislead the jury, nor did the prosecutor make any use of the exhibit (or the photographs) during her closing argument.

Appellant cites several cases from other jurisdictions, all of which we find inapposite. For example, *United States v. Gaskell*, 985 F.2d 1056 (11th Cir.1993), is unlike the case at bar because in *Gaskell* the demonstration, in addition to being particularly shocking to the eye because it involved shaking a doll to demonstrate shaken baby syndrome, had little probative value; there was no evidence that the doll shared any of the same features as the victim, nor was there any showing as to how many oscillations were actually necessary to trigger the effects of the syndrome. *Id.* at 1060–1061. *Spyrka v. County of Cook*, 366 Ill.App.3d 156, 303 Ill.Dec. 613, 851 N.E.2d 800 (2006), is distinguishable because the video animation at issue in that case was contrary to the expert testimony. *Id.* 303 Ill.Dec. 613, 851 N.E.2d at 810 ("[t]he animation makes no attempt to account for the expert testimony of [two doctors]"). *French v. City of Springfield*, 65 Ill.2d 74, 2 Ill.Dec. 271, 357 N.E.2d 438 (1976), is also unlike this case because in *French* the motion picture demonstrative aid was vastly different from the actual collision (for example, "[the] movie was filmed in daylight, while the accident occurred at night"), rendering it too prejudicial to be seen by the jury. *Id.*

2 Ill.Dec. 271, 357 N.E.2d at 442. In *Dunkle v. State,* 139 P.3d 228 (Okla.Crim. App.2006), the evidence "did not adequately support the assumptions implicit in each of the four animations" and also did not support the computer animator's "choices in defining the three possible 'versions' of [the defendant's] story." *Id.* at 250. Finally, in *Hutchison v. American Family Mutual Insurance Co.,* 514 N.W.2d 882 (Iowa 1994), the court concluded that a computer-generated animation risked "fabrication and distortion" of the facts because it "did not purport to re-create [the] accident...." *Id.* at 890.

Appellant's other unpreserved claims about the exhibit, subject to plain error review, are in our view entirely without merit or do not meet the high standard for plain error, and thus we decline to consider them here.

### III

Appellant also argues that the trial court committed plain error by allowing the prosecutor to "force [him] on cross-examination to testify that two government witnesses were lying."

During trial, while cross-examining appellant, the prosecutor asked him if he spoke with Sergeant Herrera both at the house and then at the hospital, which resulted in the following exchange:

Q. And then you talked to [Sergeant Herrera] again at the hospital, right?

A. No, I did not.

Q. You're saying you did not talk to her at the hospital?

A. I did not talk to her again at the hospital.

\* \* \* \* \* \*

Q. All right. As far as you know, she didn't have any bias against you, right?

A. Correct.

Q. And she has no reason to make anything up against you, does she?

A. Not that I know of.

\* \* \* \* \* \*

Q. Okay. So this woman who doesn't know you at all made this up against you, correct?

A. I don't know what she did. I mean, if you ask me if she talked to me, then, no, she did not talk to me. You can draw the conclusion.

Q. So you can remember some details, just not ones that are harmful to you, is that what you're saying?

MR. CALEB [defense counsel]: Objection. Argumentative.

THE COURT: Sustained.

Shortly thereafter, a similar exchange took place when the prosecutor asked appellant about another witness, Dr. Tanya Hinds:

Q. Now, you talked to Dr. Hinds, correct?

A. Correct.

Q. And Dr. Hinds asked you about the fall on the 14th, right?

A. I believe she did.

\* \* \* \* \* \*

Q. And the only fall that you told her about is what happened on the 14th, right?

A. That's the only fall I [saw].

Q. Okay. And you told her that you saw that fall, didn't you?

A. Not that I can remember. If it's in a statement and I said it, then maybe I did.

Q. Okay. Well, you agree she was paying attention to what you were saying, right?

MR. CALEB: Objection.

A. I would agree that she had a co-worker there—

Mr. Caleb: Objection.

The Court: Overruled.

A.—that could have acted as a witness and she said she had handwritten statements. But when she transferred her handwritten statements to typed statements, I would agree that she conveniently got rid of the handwritten statement.

Q. Okay. So Dr. Hinds is against you too?

A. No, she's not against me, it's just convenient that she got rid of something that could possibly say, hey, this didn't happen. On the typed statement that she had, I think she made a big mistake by saying that she talked to me on the 17th and not the 16th. So if Dr. Hinds can make mistakes, how come Defendant Timothy Lloyd can't make mistakes.

Q. Okay. And you would agree, though, that Dr. Hinds went back and noted her mistake, correct?

A. Yes, she did.

Q. Now—and Dr. Hinds was paying attention, as far as you could tell, to what you were saying, correct?

A. I don't know what Dr. Hinds was doing. I mean, I'm not in Dr. Hinds' mind, if she was paying attention, if she wasn't paying attention.

Q. Okay. Well, she was writing down things you were saying, right?

A. Correct.

Q. And she said that you said you saw the fall, correct?

A. Correct.

Later, during closing argument, the prosecutor referred to her earlier line of questioning, stating: "Technician Herrera has nothing against this man, doesn't know him from anybody. Yet, according to the defendant, she made up that second statement as well." The prosecutor added, "The defendant simply got up there ... and tried to explain away all the evidence that makes him look guilty by coming up with some grand conspiracy theory that not just the doctors, but the police are interested for absolutely no reason in convicting this man of child abuse."

■ More than twenty years ago, in *McLeod v. United States*, 568 A.2d 1094 (D.C.1990), we declared:

Asking the witness on the stand whether another witness's testimony is "accurate" is equivalent to asking the witness whether the other witness was lying or mistaken.... [T]his line of questioning is impermissible. We urge that litigants in this jurisdiction desist from attempting to find "nice" distinctions between phrasings which we have already explicitly condemned and those we have not yet explicitly condemned. *What is prohibited is seeking to have one witness comment or opine on the credibility of a prior witness, however phrased.*

*Id.* at 1097 (emphasis added); *see also Allen v. United States*, 837 A.2d 917, 920–921 (D.C.2003) (rejecting "the false supposition that the witness must have perjured himself to be disbelieved"); *Scott v. United States*, 619 A.2d 917, 925 (D.C.1993) ("such questioning is patently improper").

■ The prosecutor's questions in this case should not have been asked, and the court should have intervened to curtail them. On the other hand, those questions—and, indeed, the testimony of at least one witness, Sergeant Herrera—were of marginal relevance. We therefore hold that the court's failure to interrupt the prosecutor *sua sponte* and direct her to cease that line of questioning did not constitute plain error.

Despite the prosecutor's reference to the questioning during her closing argument, the trial court instructed the jury that statements by the attorneys did not constitute evidence and that the jurors were the sole judges of the credibility of the witnesses. *See Freeman v. United States,* 495 A.2d 1183, 1188 (D.C.1985) (finding no plain error because, at least in part, the prosecutor's improper questions were mitigated by court's general credibility instructions, even though we were "troubled by the recurrence of this particular type of attorney misconduct," citing three other cases that had come before us on appeal "in little more than a year"); *Carter v. United States,* 475 A.2d 1118, 1126 (D.C. 1984) (no plain error because trial court instructed jurors that they were the sole judges of credibility of witnesses); *see also Wright v. United States,* 513 A.2d 804, 811 (D.C.1986) (error not prejudicial because court twice instructed jurors that they were sole judges of credibility).

More importantly, the matters to which the disputed questioning pertained—whether appellant saw Sergeant Herrera both at the house and at the hospital, and whether or not Dr. Hinds properly copied her notes and therefore correctly reported that appellant had witnessed A.M.'s alleged fall down the stairs a few days earlier—were brief deviations over the course of the trial and relatively tangential in nature. Indeed, the government's questioning about Dr. Hinds was at least arguably justified because appellant, during his testimony, was initially equivocal about whether he was an actual eyewitness to A.M.'s alleged fall down the stairs or simply heard that it had happened. In light of the entire record, we are satisfied that any prejudice resulting from the prosecutor's improper questioning was relatively slight, and that the court did not commit plain error by failing to intervene.

IV

We conclude that any error in the government's use of the demonstrative illustration was harmless and that the prosecutor's questions to appellant on cross-examination did not give rise to plain error. The judgment of conviction is therefore

*Affirmed.*