*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-1145, 11-CF-1284, 11-CF-1644, & 12-CO-40

TAWANDA SHEFFIELD, STEVEN D. LEWIS, and ALLEN BUTLER, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-24022-09, CF1-18224-09, & CF1-28939-08)

(Hon. William M. Jackson, Trial Judge)

(Argued June 5, 2014                                           Decided March 12, 2015)

*Michael L. Spekter* for appellant Tawanda Sheffield.

*Sydney J. Hoffmann* for appellant Steven D. Lewis.

*Thomas T. Heslep* for appellant Allen Butler.

*David P. Saybolt*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Kevin Flynn*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, THOMPSON, *Associate Judge*, and NEBEKER, *Senior Judge*.

NEBEKER, *Senior Judge*:  In this consolidated appeal, appellants Allen Butler

and Steven D. Lewis appeal from their convictions for the lesser-included offense

of second-degree murder while armed (D.C. Code § 22-2403, -4502) and various accompanying weapon convictions. Appellant Tawanda Sheffield also appeals her convictions for two counts of obstruction of justice (D.C. Code § 22-722 (a)(6)) and one count of perjury (D.C. Code § 22-2402 (a)(1)). Appellants raise ten issues on appeal, asserting violations of their Fourth Amendment rights, *Miranda* rights, and confrontation rights, and also asserting, among other claims, *Brady* violations, improper rebuttal testimony, a prejudicial jury demonstration, and insufficient evidence to support the various convictions. We have limited our consideration to the stronger issues presented, and any arguments not directly addressed are deemed to not warrant such treatment, especially not reversal of any convictions on this record on appeal. For the reasons stated below, we affirm in part and remand for vacatur of one of Sheffield's obstruction of justice convictions and adjustment of Sheffield's sentence as may be necessary.

## I. Factual Overview

### A. The Murder and Bloody Pants Evidence

On December 11, 2008, around 8:00 a.m., in the District of Columbia, Butler and Lewis forcefully entered the home of Franklin Johnson, a known drug

dealer, in an attempted robbery. The home, a short drive away from Prince George's County Hospital, was occupied by Johnson; the sister of Johnson's girlfriend, Donna Galloway; Johnson's one-year-old child; and two other children, J.B. (age five), and L.B. (age six). Butler and Lewis, wearing black masks covering all but their eyes, forced their way into the home. Once inside, the men began shooting, killing Johnson and wounding J.B. Butler was also shot in his leg during the encounter. Forensic analysis revealed that Johnson was shot ten times at close range, and the bullets recovered were consistent with having been fired by two guns. Butler and Lewis fled the scene in a burgundy mini-van with Georgia tags.

At 8:37 a.m., Butler was admitted to Prince George's County Hospital for treatment of a gunshot wound to his leg. During the course of treatment, the Hospital staff removed his pants and placed them in a hospital biohazard bag by Butler's bed. Pursuant to Maryland law, *see* Md. Code Ann., Health–Gen. § 20-703, the Hospital staff contacted the Prince George's County Police Department (PGPD) to report the "walk-in shooting victim" and two PGPD detectives responded to the Hospital to investigate the shooting. During the investigation, Butler presented different accounts of how he had been shot, first claiming to be a victim of a robbery and then that he had been shot by his friend's

boyfriend. As a result, the investigation was transferred back and forth between the first PGPD detectives to respond and the PGPD robbery suppression team.

PGPD investigators ultimately asked Butler to join them in canvassing the area of the alleged crime. While Butler was in the process of being discharged, PGPD Detective Gurry retrieved the bag of clothes by Butler's bed, walked to the car, and placed the bag in the trunk of the car. Detective Gurry then drove to the entrance of the Hospital and Detective Pettus came out pushing Butler in a wheelchair. Although Butler claims that he twice asked for his clothes back, the trial court did not credit this testimony.[1] For over one and one-half hours the detectives canvassed the area of Butler's alleged encounter, but Butler was not able to direct the detectives to the scene of the alleged shooting. Finally, the detectives drove Butler to the PGPD District III station, where he was picked up by Lavangela Smith, the woman who had rented the burgundy mini-van used in the get-away and with whom Butler lived and had an intimate relationship. PGPD detectives logged Butler's clothes into PGPD property, where they remained until the following day when they were released to the homicide detectives from the Metropolitan Police Department (MPD) who were investigating the D.C.

---

[1] The trial court's finding regarding Butler's testimony is important to our discussion, *infra*, of the detectives' lawful access to Butler's clothing with regard to the plain view doctrine.

murder. On December 14, 2008, Butler was arrested, pursuant to a warrant, in connection with the murder of Johnson. Later, in 2009, DNA testing of Butler's pants revealed the presence of Butler's blood and Johnson's blood. On February 12, 2009, Lewis was also arrested.

## B. Obstruction of Justice and Perjury Convictions

There was evidence that Butler had asked appellant Sheffield to provide an alibi. On December 11, at 12:45 a.m. there were two calls between Butler and Sheffield. Then, at 4:38 p.m. Sheffield texted appellant Butler's cousin, Tarik Butler, "I guess use me but its ok I'm a soldier." Later that night there was a third call between appellant Butler and Sheffield. Additionally, Damon White, a government jail house informant, testified that Butler told him that he had spoken with two sisters, appellant Sheffield and Keisha Sheffield, who were going to testify before the grand jury on his behalf. Keisha Sheffield later testified before the grand jury that Butler had asked her and her sister to provide an alibi by testifying that they all were at a club together at the time of the murder.

On December 13, 2008, MPD detectives contacted appellant Sheffield and asked her to come to their headquarters for an interview. Sheffield voluntarily

provided a videotaped statement in which she asserted that the night before the murder she had driven Butler to her home in Riverdale, Maryland around 11:45 p.m., and that Butler had remained with her until he left the next morning, around 9:30 a.m. On October 15, 2009, Sheffield repeated this assertion before a grand jury, maintaining this account despite being presented with evidence establishing that at 8:37 a.m. on December 11, 2008, Butler was at Prince George's County Hospital being treated for his gunshot wound.

## C. *Brady* Disclosures and Young Rebuttal

At trial Butler introduced a stipulation explaining that on December 11, 2008, six-year-old L.B.—an eyewitness to Johnson's shooting—told police that he recognized one of the assailants as "Gangsta," whom he had previously seen with the decedent in the Parkwood area, but that this information was not disclosed to the defense until April 8, 2011. The stipulation also stated that L.B.'s description of Gangsta was disclosed on April 21, 2011, and that L.B.'s videotaped statement was disclosed on April 28, 2011. On June 3, 2011, after trial had begun, the government notified the defense that police had discovered a man named Gary Young, Jr., who went by the nickname "Gangsta" and was an associate of Johnson at the time of his death. The government called Young and, with the court's

permission, asked him to put on the black ski mask recovered from Lewis and stand next to a redacted photo of Lewis wearing the black mask, to show that the two men looked similar and that L.B. could easily have confused one man for the other.

## II. Analysis

### A. Butler's Motion to Suppress the Clothing, the DNA Results, and His Statements to Police

Butler argues that we should vacate his conviction for the lesser-included offense of second-degree murder while armed[2] and various accompanying weapon convictions because the trial court erred by failing to suppress (1) his seized clothing, (2) the forensic test results showing Johnson's blood on his pants, and (3) his statements to police. The trial court concluded that the "seizure [fell] within the meaning of the Fourth Amendment," but that it was reasonable under the plain view exception to the warrant requirement or, alternatively, that Butler consented

---

[2] We find no merit to Butler's argument that it was error to instruct the jury on second-degree murder as a lesser-included offense of felony murder while armed because the jury could reasonably acquit Butler of felony murder by finding that he did not commit the underlying burglary felony, which is consistent with Butler's defense theory that he was at Johnson's home simply to buy drugs. There was sufficient evidence from which the jury could find that Butler formed the intent to kill on impulse while in Johnson's home.

to the search by falsely claiming to be a gunshot victim. Additionally, the trial court held that once the police lawfully had the pants in their possession, they had a right to transfer the pants to D.C. police and conduct forensic testing without a warrant. Finally, the trial court found that Butler's statements were a "voluntary" and "intelligent waiver of his *Miranda* rights" because Butler had "initiated statements to the officers and [ ] was not prompted in any way."

Our review of "a trial court's ruling on a motion to suppress tangible evidence requires that the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." *Holt v. United States*, 675 A.2d 474, 478 (D.C. 1996) (internal citation and quotation marks omitted). The trial court's determination of probable cause is a conclusion of law that we review *de novo*. *Prince v. United States*, 825 A.2d 928, 931 (D.C. 2003). We review the trial court's finding that Butler initiated discussion with police for clear error. *See Morris v. United States*, 728 A.2d 1210, 1219 (D.C. 1999).

## 1. The Seizure of Butler's Clothing

The facts surrounding this issue present two ways of resolving it. One is that the Fourth Amendment is not implicated due to the fact that the PGPD viewed

Butler not as a criminal suspect, but a victim of a shooting. If the Amendment is not implicated, there is no occasion to deal with the Amendment's requirement that a warrant based on probable cause was necessary. The other way to resolve the issue is to hold or assume that the Amendment is implicated, and that a warrant was either required or that an exception to the requirement applies. Either way, the result would be the same: the constable did not blunder and the trial judge did not err in denying the motion to suppress. To assume that the Amendment is implicated leads to a conundrum: what could be the probable cause for a warrant, as Butler was not then a criminal suspect for any offense, including a false report. Thus, no warrant could issue and the pants remain corroborative evidence of the reported robbery and assault. It is unnecessary even to consider, as the trial judge did, that Butler's report amounted to a waiver because the elements of a waiver are not present. Nor, as we will see, would a warrant be necessary when the PGPD transferred the pants to MPD.

Assuming that the Fourth Amendment did apply, the trial court did not err in admitting the evidence. In *Holt*, *supra*, we upheld investigators' initial search of the appellant's clothing in a public hospital and the subsequent seizure of the clothing incident to his lawful arrest. 675 A.2d at479-81. Just as in this case, the appellant in *Holt* was voluntarily admitted to a public hospital with a gunshot

wound, during treatment his clothing was removed and placed in a bag in his room, and there was no indication that he asked to secure his clothes in a locker. *Id.* at 480. The police inspected Holt's clothing to determine that it was consistent with a lookout description call to police, and subsequently seized the clothing incident to arrest. *Id.* at 477-78. We held that the *search* was lawful as the appellant "had no reasonable expectation of privacy in the appearance of his publicly worn clothing" under the circumstances. *Id.* at 480-81 (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (alteration in original) ("'[W]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection' because the exposure withdraws any expectation of privacy.")). Other courts have upheld similar searches, finding that there is no reasonable expectation of privacy in personal effects in an emergency room. *See, e.g.*, *People v. Sutherland*, 415 N.E.2d 1267, 1271 (Ill. App. Ct. 1980); *State v. Smith*, 559 P.2d 970, 976 (Wash. 1977) (en banc); *Wagner v. Hedrick*, 383 S.E.2d 286, 291-92 (W. Va. 1989).

The reasoning in *Holt* alone, however, will not suffice to uphold the officers' collection of Butler's clothing in this case because the Fourth Amendment protects against unreasonable seizures of property in which the individual has a possessory interest, even if a privacy or liberty interest is not at issue. For the purposes of the Fourth Amendment, a "'seizure' of property occurs when there is some meaningful

interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Although we have previously held that a party seeking to suppress evidence unlawfully seized "must first prove that he had a legitimate expectation of privacy in . . . the item seized," *In re B.K.C.*, 413 A.2d 894, 899 (D.C. 1980), subsequent United States Supreme Court decisions have contrarily held that the Fourth Amendment protects against unreasonable seizures of property even when a privacy or liberty interest is not at issue, *see, e.g.*, *United States v. Jones*, 132 S. Ct. 945, 952 (2012) ("[T]he Katz reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."); *United States v. Flores-Montano*, 541 U.S. 149, 154-55 (2004); *United States v. Padilla*, 508 U.S. 77, 80-81 (1993); *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 65-66 (1992).

In *Soldal*, *supra*, the Supreme Court noted that none "of the Court's prior cases supports the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated," explaining that "the absence of a privacy interest notwithstanding, '[a] seizure of the article . . . would obviously invade the owner's possessory interest.'" 506 U.S. at 65-66 (alterations in original) (quoting *Horton v. California*, 496 U.S. 128, 134 (1990)); *see also Flores-Montano*, *supra*, 541 U.S. at 154 ("[T]he Fourth Amendment

'protects property as well as privacy.'") (quoting *Soldal*, *supra*, 506 U.S. at 62); *United States v. Jones*, 625 F.3d 766, 770 (D.C. Cir. 2010) (same); *United States v. Davis*, 657 F. Supp. 2d 630, 636 (D. Md. 2009) ("[T]o challenge a *seizure*, a defendant need only establish that the seizure interfered with his constitutionally protected possessory interests. The infringement of privacy rights, while often a precursor to a seizure of property, is not necessary to such challenge."), *aff'd*, 690 F.3d 226 (4th Cir. 2012); *Jones v. State*, 648 So. 2d 669, 675 (Fla. 1994) ( "[E]ven if we were to find that Jones'[s] privacy interests were in no way compromised, there clearly was a meaningful interference with his constitutionally protected possessory rights when his effects were seized without a warrant."); *People v. Hayes*, 584 N.Y.S.2d 1001, 1002 (N.Y. Sup. Ct. 1992) (concluding that the defendant's property rights were violated when his belongings were removed from a hospital without a warrant). Therefore, despite our holding in *Holt* that an individual entering a public hospital with a gunshot wound has no reasonable expectation of privacy in their appearance, we recognize Butler's separate possessory interest in his clothes and address for the first time whether under these circumstances a *seizure* of such property violates the Fourth Amendment.

It is undisputed that Butler's clothing was removed from his hospital room without a warrant. Warrantless seizures are "subject to only a few specifically

established and well-delineated exceptions."[3]  *Katz, supra*, 389 U.S. at 357; *see also, e.g.*, *Martin v. United States*, 952 A.2d 181, 186 (D.C. 2008).  However, the "plain view" exception to the warrant requirement "permits law enforcement to seize objects if (1) the officer is lawfully present in the location where the observation is made[;] (2) the officer has lawful access to the item[;] and (3) the object's incriminating nature is immediately apparent," *Davis, supra*, 657 F. Supp. 2d at 637; *see also Horton, supra*, 496 U.S. at 136-37; *Porter v. United States*, 37 A.3d 251, 256-57 (D.C. 2012), or it is clear to the law enforcement officer that the object is or contains evidence of a crime, *United States v. Pindell*, 336 F.3d 1049, 1055 (D.C. Cir. 2003).  The discovery of evidence in plain view need not be inadvertent.  *Horton, supra*, 496 U.S. at 130.  In the instant case, these plain view criteria are satisfied, even though the incriminating nature of the bloody pants was not as immediately apparent as their evidentiary value in relation to Butler's original claim that he was a victim.

First, the police were lawfully in Butler's hospital room on official business to investigate a reported shooting because they were contacted by the hospital staff to report the "walk-in shooting victim" and later returned to investigate the crime

---

[3]  The trial court relied on a theory of plain view and alternatively implied consent to justify the seizure.  We affirm without relying on the ground of consent.

reported by Butler. Second, the officers had lawful access to Butler's clothing because, as we held in *Holt*, *supra*, there is no expectation of privacy in clothing in a public hospital where one's appearance upon arrival is public. 675 A.2d at 48. The officers, therefore, did not invade Butler's privacy interest by noting Butler's bloody clothes in the biohazard bag by his bed.

Finally, the importance of Butler's clothing was immediately apparent because the officers had "probable cause to believe that [it] contained evidence of a crime." *Pindell*, *supra*, 336 F.3d at 1055. "[W]hen a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *Davis*, *supra*, 657 F. Supp. 2d at 638 (internal citation and quotation marks omitted). Additionally, "[t]he circumstances under which an officer finds the container may add to the apparent nature of its contents." *Id.* Detective Gurry testified that he regularly responded to gunshot wound calls at hospitals and that it was standard practice to ask for the hospital bag containing the victim's property. The detectives knew that Butler had a gunshot wound in his leg, an area of the body that is usually covered by clothing, and that he was claiming to be the victim of a shooting. They photographed Butler's bleeding wound, saw the red biohazard bag containing his bloody clothing by his bed, and were told by the

nurse and Butler that the bag contained Butler's clothes.  It was readily apparent that the bloody clothes were evidence of a crime, regardless of whether Butler was a victim or a suspect.  We conclude, therefore, that if Butler's pants were seized while he was a patient at Prince George's County Hospital, the seizure was lawful pursuant to the plain view exception to the warrant requirement.[4]

## 2. The Search Yielding Johnson's DNA

The extraction of blood from Butler's clothing and the subsequent forensic testing of the blood are both searches subject to scrutiny under the Fourth Amendment.  The Supreme Court has held in several instances that "the government's use of scientific technology to reveal information that is not visible to the naked eye or routinely exposed to the public constitutes a search." *See Davis*, *supra*, 657 F. Supp. 2d at 644 (listing the Court's technology cases).

---

[4] Because the assumed seizure was lawful, there is no merit to Butler's assertion that transfer of his clothes from PGPD to MPD violated his Fourth Amendment rights. To hold otherwise would nonsensically submit lawfully obtained evidence to redundant Fourth Amendment assessments at each point of transfer between governmental units.  As the Ninth Circuit has explained, a warrant requirement for transfers would cause "complex procedural barriers to cooperation between state and federal law enforcement authorities" and is unnecessary because "examination by another law enforcement agency is not a sufficiently distinct intrusion into the defendants' privacy to trigger the requirements of the Fourth Amendment." *United States v. Romero*, 585 F.2d 391, 396 (9th Cir. 1978).

However, the Court has held more specifically that "clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis," the results of which are admissible at trial. *United States v. Edwards*, 415 U.S. 800, 804 (1974). In upholding the reasonableness of these types of searches, the Court explained that "it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody." *Id.* at 806.

The D.C. Circuit, in a pre-1971 case binding on this court, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), similarly affirmed a warrantless search and seizure incident to arrest where police seized defendant's clothing and conducted forensic testing of the clothing at the Federal Bureau of Investigation to reveal paint chips and other debris from the crime scene, *see Robinson v. United States*, 283 F.2d 508, 509-10 (D.C. Cir. 1960). The court explained that the search and seizure were "proper, since probable cause [of guilt] had already appeared, and appellants were validly under arrest." *Id.* at 509. Although *Edwards* and *Robinson* were decided in the context of a search and seizure incident to a lawful arrest, the same rationale applies with equal force in this case of a plain-view seizure in

which Butler's arrest nonetheless preceded the testing of his assumed lawfully seized clothes.[5]

The additional privacy considerations that usually arise in cases involving DNA testing are not present in this case. The blood samples were collected from Butler's lawfully seized pants and therefore did not require any bodily intrusion. This distinguishes the case from those in which DNA collection requires "the type of 'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny." *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (quoting *Terry v. Ohio*, 392 U.S. 1, 24-25 (1968)) (holding that scraping dried blood from underneath the suspect's fingernails constituted such a search). Additionally, while DNA results identifying both Butler and Johnson were admitted into evidence, Butler argues that it was the tests yielding DNA from Johnson that were the "crucial link in obtaining the conviction." Having established that Butler's clothing was lawfully seized, it is absurd that Butler would have any legitimate expectation of privacy in the decedent's blood on his pants that would warrant suppression of the victim's DNA at trial. As to Butler's DNA evidence, as a detainee his expectation of privacy "necessarily [is] of a diminished scope" and the

---

[5] Butler was arrested pursuant to an arrest warrant three days after PGPD seized his clothing and well before any testing of his pants commenced in 2009.

Supreme Court has upheld the analysis of an arrestee's DNA as a form of identification that is reasonable under the Fourth Amendment. *Maryland v. King*, 133 S. Ct. 1958, 1978 (2013) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)).[6]

Courts most often decide Fourth Amendment questions by a traditional method of matching the facts of previously reported decisions with facts of the pending case. This is true whether the pending decision favors the defendant or the government. Such an approach, like a river course or electricity, is one of taking the path of least resistance. While case matching may be helpful in deciding reasonableness of police conduct, when we have so many published decisions going both ways on similar questions of reasonableness, it seems that judges often decide which ones to follow based on subjective, rather than objective, reasonableness. But we cannot avoid recognizing that reasonableness is the overarching and underlying principle for these decisions. In this opinion we do a fair amount of case matching, but on these unique facts (feigning victimhood, discovery of its falsity, plain view of the tell-tale pants, and convergence of inter-police department investigations) we find nothing unreasonable in the police

---

[6] No claim is presented here that the DNA testing went to matters other than identification so as to intrude upon Butler's privacy interest in information about medical conditions, hidden traits, or similar information that can be gleaned from DNA.

reaction to any or all of what was done. In sum, the search and assumed seizure of Butler's clothing did not violate his Fourth Amendment rights.

### 3. Butler's Statements to Police

Butler argues that it was error for the trial court to deny his motion to suppress the statements he made to the officers who drove him to be processed at the central cellblock, alleging that he was in medical distress and that he should have been re-advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), pursuant to *Edwards v. Arizona*, 451 U.S. 477 (1981). The prophylactic rule of *Edwards*, *supra*, does not apply when "the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 485; *see also Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent"). After considering all of the evidence, the trial court found that Butler's statements were a "voluntary" and "intelligent waiver of his *Miranda* rights" because he was "clearheaded and did not appear to be under any type of distress or disoriented," and that there was no coercive conduct or even interrogation by police during the drive. In fact, the court found that Butler had "initiated statements to the officers, and [ ] was not prompted

in any way," when he told the officer "there were some things he wanted to get off his chest." On the facts found by the trial court, which Butler does not allege were clearly erroneous, we find that Butler's claim lacks merit and we affirm the trial court's denial of the motion to suppress. *See Bean v. United States*, 17 A.3d 635, 638-39 (D.C. 2011) ("'[A]ny factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous.'") (quoting *Stroman v. United States*, 878 A.2d 1241, 1244 (D.C. 2005)).

**B. Butler's Claim that Dr. Pierre-Louis's Expert Testimony Violated His Confrontation Rights**

Butler claims for the first time on appeal that his confrontation rights were violated by the expert testimony of Dr. Pierre-Louis, the District's Chief Medical Examiner, arguing that she did not perform the autopsy herself and some of her expert opinions were derived from reading the autopsy report and notes. "When a defendant fails to object to the admission of certain testimony, and then further develops that testimony on cross-examination, he will not be heard to argue on appeal that its admission constituted reversible error." *Sobin v. District of Columbia*, 494 A.2d 1272, 1275 (D.C. 1985). Dr. Pierre-Louis was qualified as an expert in the field of forensic pathology and she testified that she had reviewed the

autopsy file, which was not offered into evidence, and would be offering her own independent conclusions. Butler's counsel stated that he did not object to the expert using the autopsy report and drawing her own conclusions and did not raise any hearsay objections to particular testimony or confrontation objections. In fact, during cross-examination Butler's counsel elicited the expert's testimony on the number of wounds and bullets recovered from Johnson's body, evidence of soot and stippling indicating shots fired at close range, and he relied on this testimony during closing argument. Butler cannot contest Dr. Pierre-Louis's expert testimony, when he failed to object, further developed it on cross-examination, and relied on it during closing arguments. *Id.* In any case, Butler cannot demonstrate whether Dr. Pierre-Louis relied on the autopsy report or autopsy photographs, and neither this court nor the Supreme Court has decided whether autopsy reports are testimonial; Butler therefore cannot show plain error. *See Euceda v. United States*, 66 A.3d 994, 1012 (D.C. 2013).

## C. Butler and Lewis's Asserted *Brady* Violations

Butler and Lewis claim that the trial court abused its discretion by denying their motions for mistrial based on two asserted violations of *Brady v. Maryland*, 373 U.S. 83 (1963). We reverse a trial court's denial of motion for mistrial "only

if it appears irrational, unreasonable, or so extreme that the failure to reverse would result in a miscarriage of justice." *Coleman v. United States*, 779 A.2d 297, 302 (D.C. 2001) (internal citation and quotation marks omitted). Whether an appellant has established a *Brady* violation is a mixed question of fact and law, and we therefore review the trial court's legal conclusions *de novo* and its findings of fact for clear error. *Miller v. United States*, 14 A.3d 1094, 1120 (D.C. 2011) (quoting *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993)).

As to the first asserted *Brady* violation regarding L.B.'s identification of one of the shooters as Gangsta, the government concedes that the identification was inadvertently not disclosed until about six weeks before trial. Butler and Lewis, however, did not move for a continuance and it was not until June 2, 2011—during the second week of trial—that they moved for a mistrial on the ground that they had searched for Gangsta with no success. The trial court denied the motion, finding that the late disclosure could have been remedied by a continuance to permit further investigation, and ordered the government to identify the steps it had taken to identify Gangsta and further steps it could take.

The trial court did not abuse its discretion by denying the motion given Butler's and Lewis's strategic decisions to not request a continuance before trial

and their failure to establish any resulting prejudice. During its opening statement, the government did not make any mention of Gangsta and it told the jury that they would not hear from any eyewitness to the murder who could identify the shooters. By contrast, Butler's and Lewis's opening statements, defense theories, and closing arguments made use of the *Brady* information by refuting the government's assertion that there were no eyewitnesses who could identify the shooters and alleging police bias.

Butler's and Lewis's second asserted *Brady* violation is the mid-trial discovery that Gangsta was actually Young. On June 3, 2011, the government told Butler and Lewis that their lead detective had discovered (the night before) a man named Gary Young, Jr., who went by the nickname Gangsta, was an associate of Johnson at the time of his death, and looked similar to the description of Gangsta. Butler and Lewis renewed their motions for a mistrial, which the court denied because trial counsel were extremely experienced and had chosen not to raise the Gangsta issue until trial had started, the available remedies were limited, and Young and L.B. were available for interview and to testify. We affirm the trial court's denial of Butler's and Lewis's renewed motions for a mistrial because the court's findings are not plainly wrong or without factual support, and furthermore, because the government's immediate disclosure of the information upon discovery

mid-trial does not constitute the "suppression" required for a *Brady* violation. *Miller*, *supra*, 14 A.3d at 1107 (quoting *Brady*, *supra*, 373 U.S. at 87).

## D. Lewis's Claims of Improper Rebuttal Testimony and Prejudicial Jury Demonstration

Lewis claims that the trial court committed plain error by allowing Young's rebuttal testimony and permitting the government to conduct the ski mask demonstration for the jury. "Rebuttal evidence refutes, contradicts, impeaches, or disproves an adversary's evidence." *Beynum v. United States*, 480 A.2d 698, 704 (D.C. 1984). The government called Young in rebuttal to Butler's and Lewis's use of L.B.'s testimony that the shooter was or looked like Gangsta and L.B.'s December 2008 statement that Gangsta was the shooter. Young testified that others had used the nickname "Gangsta" to refer to him, but that he was so close to Johnson that he could not be the killer, thereby contradicting L.B.'s December 2008 statement to police and refuting Butler's and Lewis's suggestions that Young was not Gangsta. The trial court, therefore, did not commit plain error in allowing this rebuttal testimony. Given Lewis's failure to object, the strong evidence against him, and the equivocal nature of both L.B.'s and Young's testimony, we are satisfied that the rebuttal testimony did not prejudice Lewis's "substantial rights" or "seriously affect . . . the fairness, integrity or public reputation" of the

proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal citation and quotation marks omitted).

Additionally, during Young's rebuttal testimony, the court permitted Young to conduct a demonstration for the jury over Lewis's objection. The government asked Young to put on a black ski mask recovered from Lewis and stand next to a cropped photo depicting Lewis alone, also wearing a mask. We review the trial court's admission of demonstrative evidence for abuse of discretion. *See Lloyd v. United States*, 64 A.3d 405, 409 (D.C. 2013). "The court may permit the introduction or use of a demonstrative aid if it is sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact." *Id.* (internal citation and quotation marks omitted). However, otherwise relevant evidence "'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (quoting Fed. R. Evid. 403). Here, the ski mask demonstration was illustrative of L.B.'s relevant testimony that the shooter he saw in a mask looked like Gangsta. The demonstration was more probative than it was prejudicial because it could help the jury determine whether Lewis, around the time of the shooting, met L.B.'s description of the shooter as someone who looked

like Gangsta. The trial court, therefore, did not abuse its discretion by permitting the demonstration.

**E. Lewis's and Sheffield's Claims of Insufficient Evidence to Support Their Convictions**

Both Lewis and Sheffield challenge the sufficiency of the evidence to support their convictions. The standard for overturning convictions for evidentiary insufficiency is a demanding one, under which "appellants face a difficult burden." *Bolden v. United States*, 835 A.2d 532, 534 (D.C. 2003) (per curiam). We "review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987).

**1. Lewis's Claim of Insufficient Evidence**

Lewis challenges the sufficiency of the evidence to support his convictions of second-degree murder while armed, assault with intent to kill while armed, and the related weapons offenses, arguing that there was not enough evidence to identify him as one of the two shooters. Although no eyewitness identified Lewis

as the second shooter, the government introduced sufficient evidence from which the jury could find him guilty. This evidence includes Lewis's discussion on the day of the murder with his neighbors Kenneth Williams and Lisa Thompson regarding a trip "uptown" where his companion had been shot and how he had taken the companion to the hospital. Additionally, the burned burgundy van, used to get away from the murder, was found near Lewis's apartment complex. Call records also show communications between Butler, Lewis, and Smith on the day of the murder, and Smith testified about Butler's call from Lewis's cell phone the morning of the murder. Furthermore, cell tower location records suggest that Butler and Lewis were together in the late-night hours leading up to the murder and while fleeing away from the murder along Interstate 295 to Prince George's County Hospital. Finally, White testified that Lewis admitted to him that Lewis had been on the scene of the shooting, another person there had left his DNA, and Lewis had taken the other person to the hospital. Given this evidence and the additional circumstantial evidence presented by the government, the jury had sufficient evidence from which to conclude that Lewis was one of the shooters, and therefore we find no merit to Lewis's claim.

**2. Sheffield's Claim of Insufficient Evidence**

Sheffield contends that there was insufficient evidence to support her perjury conviction and the obstruction of justice conviction arising from her grand jury testimony. These charges arose from Sheffield's testimony before the grand jury in which she continuously affirmed that she and Butler were in constant company from about 12:20 a.m. until 9:30 a.m. on the day of the murder. To prove perjury, the government was required to establish that Sheffield "made a false statement of material fact under oath with knowledge of its falsity." *Gaffney v. United States*, 980 A.2d 1190, 1193 (D.C. 2009) (citing D.C. Code § 22-2402). Sheffield claims that her statements were not false or made with intent to obstruct the investigation because she simply testified that she told investigators that when Butler left that morning she looked at her cable box and it said it was 9:30 a.m., without commenting on the accuracy of the cable box. However, during the grand jury proceedings, she repeatedly affirmed that Butler was with her until 9:30 a.m., at times without qualification that this was simply the time on the cable box; moreover, she did so despite being confronted with evidence that Butler had arrived at Prince George's County Hospital at 8:37 a.m. and cell phone and cell tower evidence that at 9:30 a.m. Butler was in D.C. while she was in Riverdale, Maryland. Sheffield's repeated affirmations that Butler was with her until 9:30

a.m., when she was aware that he was actually at the Hospital by 8:37 a.m., sufficiently establishes that she testified falsely about a material fact with knowledge of the falsity.

To prove obstruction of justice the government was required to show that Sheffield "(1) obstructed or impeded or endeavored to obstruct or impede the due administration of justice in an official proceeding, and (2) did so with the intent to undermine the integrity of the pending investigation." *Smith v. United States*, 68 A.3d 729, 742 (D.C. 2013) (citing D.C. Code § 22-722 (a)(6)). "The intent required for obstruction of justice often must be inferred from the context and nature of the alleged criminal conduct." *Id.* (internal citation and quotation marks omitted). Sheffield's consistently false grand jury testimony in the face of uncontroverted evidence to the contrary and the prosecutor's repeated warnings are sufficient evidence that she intentionally "endeavored to obstruct or impede the due administration of justice" in the proceedings against Butler. However, the government concedes that Sheffield's second obstruction of justice charge, based on her statement to police on December 13, 2008, must be vacated because there was not yet an "official proceeding," which is a required element of the crime. For this reason, we remand for vacatur of this obstruction of justice conviction and adjustment of Sheffield's sentence as may be necessary.

Contrary to Sheffield's claim, her convictions for obstruction of justice and perjury do not merge under the test of *Blockburger v. United States*, 284 U.S. 299 (1932), because perjury, unlike obstruction of justice, does not require proof of an official proceeding or intent to undermine the proceeding, but rather a knowing false, material statement made under oath, *compare* D.C. Code 22-722 (a)(6), *with* D.C. Code § 22-2402. *Cf. Riley v. United States*, 647 A.2d 1165, 1168 n.8 (D.C. 1994) (holding that obstruction of justice and subornation of perjury do not merge). Additionally, the trial court did not commit plain error by joining Sheffield's indictments to those of Butler and Lewis for the underlying crimes because her false alibi for Butler constituted the "same series of acts or transactions constituting an offense or offenses." Super. Ct. R. Crim. P. 8 (b); *see also, e.g.*, *Sams v. United States*, 721 A.2d 945, 954 (D.C. 1998) (concluding that an obstruction of justice count was "logically related" to the underlying substantive charges against the appellant's co-defendants). Nor was it plain error for the court to decline to sever Sheffield's case *sua sponte*. Sheffield failed to show "'manifest prejudice'" resulting from the joinder of her case with those of her co-defendants where there was independent evidence of her guilt, and the jury was properly instructed to consider each defendant's guilt separately and render separate verdicts. *Sams*, *supra*, 721 A.2d at 954 (quoting *Elliott v. United States*, 633 A.2d 27, 34-35 (D.C.1993)).

## III. Conclusion

Accordingly, for the reasons stated above, we affirm in part and remand for vacatur of one of Sheffield's obstruction of justice convictions and adjustment of Sheffield's sentence, as may be necessary.

*So ordered.*