RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0355p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 19-6367

LAMAR CLANCY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:18-cr-20058-1—John Thomas Fowlkes, Jr., District Judge.

Decided and Filed: November 12, 2020

Before: SUTTON, THAPAR, and READLER, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Eugene A. Laurenzi, GODWIN, MORRIS, LAURENZI & BLOOMFIELD, P.C., Memphis, Tennessee, for Appellant. C. David Biggers, Jr., UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. If the "robb'd that smiles steals something from the thief," William Shakespeare, *Othello*, act 1, sc. 3, what of the robbed that shoots back? When Lamar Clancy tried to rob a store at gunpoint, the store's employees responded in kind, shooting Clancy in the arm. The wound landed Clancy in the hospital, where police seized bloodied clothing they saw at his bedside. Clancy now appeals the convictions that sprang from the discovery of his clothing. We affirm.

I.

Clancy and a partner set out to rob a Boost Mobile store in Memphis, Tennessee, on December 8, 2017.  Clancy wore a "[w]hite hoodie" and "red pants . . . [with] white letters," along with "red shoes, [a] black mask, black gloves," and had a "silver gun."  R.97 at 105.  His partner wore "a black hoodie, black pants," a "black mask," and carried a gun too.  R.97 at 79.  Entering the store, they found the store's manager standing behind the counter with two other employees.  Clancy pointed his weapon and said:  "You know what time it is."  R.97 at 102.  Within seconds, the manager heard shots ring out.  He and another employee grabbed their own guns and reflexively returned fire.  Bullets flew, glass shattered, the robbers fled.  "By the time I hit that door," said one customer, "it was like cowboys and Indians."  R.97 at 132.  One employee took a shot to the knee.  The manager emerged unscathed.

Not so for Clancy.  Within fifteen minutes of the robbery, a car pulled up to Methodist South Hospital.  Two men dressed in black got the attention of an emergency technician, who found Clancy laying across the backseat with a gunshot wound to the arm.  Once hospital workers rolled him into the trauma room, the two other men left.  Clancy wore a "white, light-color jacket," "red pants with a white . . . lettering," "red" shoes, and a black glove.  R.98 at 20, 26, 108.  Once he made it to the trauma room, medical personnel stripped off his clothes and piled them on the floor.

Meanwhile, Memphis police arrived at the Boost Mobile store.  They heard descriptions of the suspects, including the one who wore "red jogging pants with a white stripe," a white sweatshirt, and a "black ski mask."  R.98 at 61, 67.  Before long, the officers learned that Methodist South had just admitted a shooting victim.  Two officers went to the hospital and walked into the emergency department, where they found Clancy and saw his clothing on the floor, "out in the open" and visible from the hallway outside his room.  R.98 at 90.  Red pants with a white stripe.  Red Nikes.  White sweatshirt.  Black ski mask.  The clothes raised suspicions.

Hospital staff airlifted Clancy to another hospital for treatment.  After he left, crime scene investigators arrived at Methodist South's emergency department.  They went to the trauma

room and found Clancy's bloodied clothes in a plastic bag. A crime scene investigator removed the clothes from the bag, then photographed each piece and put them in a paper sack.

The Government charged Clancy with two counts: attempted Hobbs Act robbery, *see* 18 U.S.C. §§ 1951, 2, and use of a firearm related to a crime of violence, *see id.* § 924(c). Clancy moved to suppress the clothing evidence, but the district court denied his motion. The jury found Clancy guilty on both counts.

II.

*Motion to suppress the clothing*. The Fourth Amendment protects "persons, houses, papers, and effects" from "unreasonable searches and seizures[.]" U.S. Const. amend. IV. Government officials ordinarily must obtain a warrant before seizing a person's private property. *United States v. Jacobsen*, 466 U.S. 109, 113–14 (1984). But there's an exception for evidence in "plain view"—for evidence that an officer saw from a lawful vantage point, the "incriminating character" of which was "immediately apparent," and for which the officer had "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136–37 (1990) (quotation omitted).

The context of this plain-view sighting goes a long way to resolving the appeal. The officer responded to an emergency call from the hospital, which notified him that it had received a shooting victim. It's hardly surprising—it's indeed expected—that police will respond to emergency departments when shooting victims show up. That's because officers are duty bound to investigate crimes, especially "reported shooting[s]." *United States v. Davis*, 690 F.3d 226, 234 n.13 (4th Cir. 2012) (upholding police presence in an emergency room by an officer "lawfully fulfilling his duty to investigate a reported shooting"); *Sheffield v. United States*, 111 A.3d 611, 620 (D.C. 2015) (noting that police were lawfully present in a hospital room "on official business to investigate a reported shooting"); *State v. Rheaume*, 889 A.2d 711, 714 (Vt. 2005) (explaining that police are "emergency workers" who "as a matter of course" show up in emergency rooms); *Craft v. Commonwealth*, 269 S.E.2d 797, 799–800 (Va. 1980) (pointing out that the officers went to the hospital to "investigat[e] an attempted robbery in which it had been reported that the robber had been shot"); *see also State v. Thompson*, 585 N.W.2d 905, 911

(Wis. Ct. App. 1998); *People v. Torres*, 494 N.E.2d 752, 755 (Ill. Ct. App. 1986); *State v. Cromb*, 185 P.3d 1120, 1126 (Or. Ct. App. 2008); *Dombrovski v. State*, Nos. A-7238, 4253, 2000 WL 1058953, at *3 (Alaska Ct. App. Aug. 2, 2000); *Buchanan v. State*, 432 So.2d 147, 148 (Fla. Dist. Ct. App. 1983).

This all makes considerable sense. With time of the essence, any hope of catching a suspect turns on nimble law enforcement willing to drop everything and rush to the hospital to gather information. Waiting for the shooting victim—who may well be a suspect—to leave the hospital runs the risk of losing track of him and, worse, of allowing him to strike again.

In this context, the seizure of Clancy's bloodied clothing readily satisfies the plain-view exception. Begin with the lawful vantage point from which the officer viewed the evidence. This was not "a constitutionally protected area." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quotation omitted). A cognizable search simply does not occur when officers "merely look[] at what is already exposed to view[.]" *Arizona v. Hicks*, 480 U.S. 321, 328 (1987). The officer saw Clancy's clothing from a common area, not unlike the "open common hallway[s]" of apartment buildings. *United States v. Dillard*, 438 F.3d 675, 684 (6th Cir. 2006). Recall that Clancy's clothing was "out in the open" and visible to those passing by his room. R.98 at 48. That's where the officer saw his clothes: from "the hallway, looking in." R.100 at 18–19. Anyone who has spent time in a hospital knows that emergency department corridors are major arteries filled with doctors, nurses, family members, and visitors alike. The officer who viewed Clancy's clothes from that vantage point did not violate Clancy's Fourth Amendment rights by walking these busy halls like everyone else.

Turn to the incriminating nature of Clancy's clothes. It's enough that the officers immediately had probable cause to believe the seized property was evidence of a crime. *Hicks*, 480 U.S. at 326–28. The police radio broadcast painted a clear picture: red jogging pants with a white stripe, a white sweatshirt, and a black ski mask. That's just what the officer saw: red jogging pants with a white stripe and a white sweatshirt. More still, he saw the black ski mask, a giveaway that Clancy wasn't merely a gunshot victim in the wrong place at the wrong time.

The officers also had lawful access to Clancy's clothes. That requirement "guard[s] against warrantless entry onto premises," preventing officers from trespassing on private property merely because they spot incriminating evidence there. *Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1672 (2018). No such trespass occurred in the hospital room. Clancy had been airlifted by the time officers seized the clothing they found in his trauma room. And we are hard-pressed to see how the officers trespassed at all. It's "routine" operating procedure for officers to show up at the hospital when its emergency department receives a shooting victim. R.100 at 51; *see Davis*, 690 F.3d at 234 n.13; *Sheffield*, 111 A.3d at 620.

Resisting this conclusion, Clancy claims that patients have a reasonable expectation of privacy in hospital rooms. Maybe yes; maybe no—and perhaps more likely no in an emergency room. *Compare Jones v. State*, 648 So.2d 669, 677 (Fla. 1994), *with Davis*, 690 F.3d at 238 n.19 and *State v. Morgan*, 440 P.3d 136, 139–40 (Wash. 2019). But it makes no difference here. While the officers eventually entered Clancy's room, they could see his bloodied clothing from the hallway—a public thoroughfare, not a private space. No incursion on Clancy's reasonable expectation of privacy led to their discovery of his clothes. And even if Clancy did maintain a reasonable expectation of privacy in his hospital room during treatment, remember that the officers seized his clothing after medical personnel airlifted him away. There is no reason to think his privacy expectation would persist after he left the hospital and medical personnel began preparing the room for new patients. *Cf. United States v. Lanier*, 636 F.3d 228, 232 (6th Cir. 2011).

Clancy adds that the officers did not inadvertently happen upon his clothing. They went to the hospital looking for a shooting victim tied to the attempted robbery of the Boost Mobile store. But inadvertence has nothing to do with it. *Horton*, 496 U.S. at 130. Even though happenstance is often "a characteristic" of "legitimate 'plain-view' seizures," it is not required. *Id.* The inquiry simply does not implicate the officer's state of mind. *See id.* at 138; *cf. Whren v. United States*, 517 U.S. 806, 813 (1996).

Clancy persists that, because the officers did not seize the clothing as soon as they saw it, plain view does not apply, invoking *People v. Tashbaeva*, 938 N.Y.S.2d 873 (N.Y. Crim. Ct.

2012).  The exception does not apply, that court reasoned, to a "subsequent warrantless seizure" if "the evidence has not been secured by a continuous police presence."  *Id.* at 879.  Right or not, *Tashbaeva* would not alter today's conclusion.  The officers in Clancy's case stayed at the hospital and waited for the crime scene unit to arrive before returning to the trauma room to bag Clancy's bloodied clothes.  That they didn't keep eyes on the clothing the entire time doesn't mean they failed to secure the evidence.  A rule to the contrary would turn plain view into a staring contest, not a practical exception to the warrant requirement.

*United States v. Neely*, 345 F.3d 366 (5th Cir. 2003), also does not give us pause.  Many of the circumstances in *Neely*, it's true, parallel the facts here.  Eerily so.  *Neely* too arose from a robbery gone wrong, committed by a suspect donned in red and white clothing and a ski mask, whose car got into an accident during the escape.  *Id.* at 367–68.  And it too involved a suspect who suffered a gunshot wound and wound up at a hospital in Memphis, where medical personnel cut off his blood-soaked clothes, and Memphis police seized the incriminating evidence.  *Id.*

But these small-world similarities should not obscure a key difference:  The *Neely* officers seized the bloodied clothes after they had already been removed, bagged, and transferred to the hospital's storeroom for safekeeping, far from sight.  *Id.* at 368.  Because the object must "be in plain view at the time of seizure" and because the officer must have "lawful right of access," the Fifth Circuit found the search unlawful.  *Id.* at 371.  By contrast, this seizure fits *Neely*'s test.  The hospital did not store Clancy's clothing or remove it from the trauma room while doctors attended to his gunshot wound.  And the officers had lawful access because the hospital routinely called police upon receiving a gunshot victim.  No doubt, someone at the hospital put Clancy's clothing into a "plastic bag[]," R.98 at 107, before the crime scene investigators arrived.  But that was only after officers saw the evidence in the first place from the hallway.

*Crime of violence charge*.  Clancy appeals his conviction under 18 U.S.C. § 924(c) on the ground that an attempted Hobbs Act robbery does not constitute a "crime of violence."  As Clancy acknowledges, he did not raise this objection at trial.  That means we review this late objection for plain error.  *See United States v. Houston*, 792 F.3d 663, 666 (6th Cir. 2015); Fed. R. Crim. P. 52(b).  That's an exacting standard.  Clancy must show (1) an actual "error or

defect," (2) that is "clear or obvious," (3) affecting his "substantial rights," (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quotations omitted).

No plain error occurred. Section 924(c) offers two routes for a felony to count as a "crime of violence." The first is by way of the elements clause, which requires the felony to have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The second is by way of the "residual" clause, which requires the felony to involve "a substantial risk that physical force . . . may be used[.]" *Id.* § 924(c)(3)(B). Because the "residual" clause is unconstitutionally vague, *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019), all that matters now is whether the elements clause applies.

We have yet to address this question head on. And we need not do so today. Either way, no clear error occurred. For one thing, the absence of clear authority in our circuit makes it unlikely that the district court committed a "clear or obvious" error. For another, we have held that completed Hobbs Act robbery counts as a crime of violence under § 924(c), *see United States v. Gooch*, 850 F.3d 285, 291–92 (6th Cir. 2017), and there is reason to think attempted crimes of violence count too, *see Hill v. United States*, 877 F.3d 717, 719 (7th Cir. 2017). For yet another, at least one circuit court has held attempted Hobbs Act robbery a crime of violence under § 924(c)'s elements clause. *See United States v. St. Hubert*, 909 F.3d 335, 352–53 (11th Cir. 2018). *But see United States v. Taylor*, No. 19-7616, 2020 WL 6053317, at *1 (4th Cir. Oct. 14, 2020). All of this shows that no plain error occurred.

Clancy suggests that because he raised his objection at sentencing, we should review this issue with fresh eyes. But that would belittle the plain error doctrine, the point of which is to give the district court an opportunity to correct itself when the problem arises. *Cf. United States v. Simmons*, 587 F.3d 348, 356 (6th Cir. 2009). Clancy adds that the Supreme Court had not decided *Davis* before his trial, leaving him with no reason to object. But just because a subsequent decision might change the calculus about whether to object does not mean we discard the plain error standard. *See United States v. Henry*, 797 F.3d 371, 374 (6th Cir. 2015). *Davis* at any rate offers no explanation for failing to preserve his elements-clause argument.

*Aiding and abetting instruction.* Clancy argues that the district court's aiding and abetting instruction was defective because it did not require proof that Clancy knew in advance that an accomplice would use or carry a firearm. Plain error applies here too because he did not raise the objection below. *See Houston*, 792 F.3d at 666.

No error occurred. The district court told the jury that, to convict Clancy under § 924(c), it must find that "while being aided and abetted by others unknown, [he] knowingly used, carried, brandished and discharged a firearm." R.98 at 192–93. Clancy himself used a firearm, so that instruction makes perfect sense. The aiding and abetting portion merely refers to the fact that Clancy robbed the Boost Mobile store with another person.

Clancy invokes *Rosemond v. United States*, 572 U.S. 65 (2014), for the proposition that for one to aid and abet the use of a firearm, the government must show the aider's advance knowledge that a gun would be used. But Clancy ignores an inconvenient fact: a truly smoking gun. "Smoke from the pistol" in video surveillance footage shows that Clancy repeatedly fired his gun inside the Boost Mobile store. R.98 at 132–33. The district court's instruction did not require the jury to find that Clancy aided and abetted others. It required the jury to find that Clancy, "while being aided and abetted by others unknown," used a firearm. R.98 at 193. When a defendant takes "no action with respect to any firearm" and is charged with aiding and abetting, *Rosemond* requires proof that the defendant had "advance knowledge of a firearm's presence." 572 U.S. at 72, 81. That defense does not apply because Clancy himself brought a gun into the store, brandished it, and pulled the trigger.

We affirm.