NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0150n.06

No. 21-3003

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Apr 08, 2022<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BERNARD OPPONG, | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| Defendant-Appellant. | ) | OHIO |
| | ) | |

Before: BATCHELDER, WHITE, and BUSH, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Bernard Oppong was convicted of five counts related to his role in a health care fraud and illegal prescription scheme operated out of Health and Wellness Medical Center, LLC (HWMC) and Health and Wellness Pharmacy, LLC (HWP) in Ohio. He moved for a new trial on the ground of ineffective assistance of counsel, which the district court denied. For the following reasons, we affirm.

I.

Oppong, a medical doctor, worked at HWMC, an opioid-treatment facility owned by pharmacists Darrell Bryant and Gifty Kusi. Bryant and Kusi also owned and operated HWP. Neither holds a medical degree or license. One aspect of HWP's business was to dispense compound creams created for the treatment of various medical issues. In violation of Ohio law, Bryant and Kusi batched these creams, rather than creating them on a patient-by-patient basis.

Many patients learned about the creams and received their prescriptions from non-physicians. Often these "consultations" occurred far from health care facilities at locations, such as at a local Save A Lot grocery store, in patients' own homes via door-to-door solicitation, and from a mobile medical unit at various locations on streets around the city. These consultations often were not conducted by a medical professional and occurred without medical examinations. Several patients received the compound creams by mail, including some who had not even requested the creams. The creams did not always work, and Jornel Rivera, a physician and the medical director of HWMC, testified that less than five percent of the compound-cream prescriptions that he signed were medically necessary.

Oppong was one of the most frequent prescribers of these creams. Like others, he prescribed the creams to patients with whom he had no professional relationship. When a nurse practitioner declined requests from an HWP pharmacist to sign compound-cream prescriptions, Oppong obliged. Oppong issued more than $500,000 in prescriptions as part of the scheme, most of which were for participants enrolled in CareSource, a Medicaid managed-care organization. Most of the prescriptions were priced just under the threshold that would have required preauthorization for Medicaid reimbursement.

The HWP cream scheme was just the beginning. Back at HWMC, Bryant and Kusi requested that Oppong and other physicians pre-sign incomplete and blank prescriptions for Suboxone,[1] a Schedule III controlled substance. The prescriptions were missing legally required information, including dates, patient names, amounts to be dispensed, and instructions. Oppong pre-signed the incomplete and blank prescriptions. These pre-signed prescriptions were often

---

[1] "Suboxone is the branded version of buprenorphine naloxone . . . used for the treatment of opioid use disorder. . . . [It] alleviates symptoms of withdrawal and craving and it also blocks other opioids from working."

2

placed in patients' charts for future visits. At these future visits, patients often would not even see a physician or other medical professional before receiving a prescription. Usually, Bryant issued the prescriptions to the patients; other times, a member of HWMC's staff would fill in the prescriptions. At least one patient believed that Bryant, who presented himself as "Dr. Bryant," was a medical doctor. Oppong signed medical notes for patients who were examined by Bryant.

Federal regulations require prescriptions for controlled substances to be "dated as of, and signed on, the day when issued and . . . [to] bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). At the relevant times, Ohio regulations required all prescriptions to be "dated as of and on the day when issued," and "[a]ll prescriptions issued on paper to a patient by a prescriber [to] be . . . [m]anually signed on the day issued by the prescriber." *See* Ohio Admin. Code 4729-5-30(B)(1), (D)(1) (2017); *id.* 4729-5-30(B)(1), (14)(a) (2014).

Some other physicians at HWMC refused to take part in this practice out of concerns that it was not done with a "legitimate medical purpose in the usual course of professional practice" as required by law. Other physicians also refused to sign progress notes for patients whom they had not examined. But not Oppong.

In July 2015 and September 2016, authorities executed search warrants at HWMC. HWMC's Medicaid participation was suspended for suspected fraud. Then, in 2018, Oppong was charged with one count of conspiracy to commit health care fraud under 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349; one count of health care fraud under 18 U.S.C. §§ 1347 and 2; four counts of making false health care statements under 18 U.S.C. §§ 1035 and 2; and one count of

conspiracy to illegally distribute controlled substances under 18 U.S.C. § 841(a), in violation of 18 U.S.C. § 846.

At trial, Oppong was represented by Ohio defense attorney Kevin Conners. The Government called several witnesses, including patients who received Suboxone prescriptions and other patients who were duped by HWMC and Oppong. HWMC employees testified that Oppong pre-signed Suboxone prescriptions and signed off on patient notes for patients he had not personally seen. An analysis of the prescriptions and HWMC records revealed that Oppong signed prescriptions for patients on dates when he had not seen them. The analysis also revealed many Suboxone prescriptions signed by Oppong without the required information. On cross-examination, Oppong's counsel tried to minimize Oppong's role in the criminal enterprise, focusing instead on his allegedly clean reputation before his involvement with HWMC. Oppong did not testify, nor did Conners call any witnesses.

In May 2019, a jury convicted Oppong of five of the seven counts, including health care fraud, making false health care statements, and conspiracy to illegally distribute controlled substances.

After the trial concluded but before his sentencing, Oppong moved for a new trial based on ineffective assistance of counsel, this time with new counsel. Oppong argued that Conners's performance was constitutionally deficient for failing to call Oppong to testify and failing to call witnesses to testify. Oppong asserted that "[h]is testimony and the testimony of the physicians who agreed to testify for him would have provided a basis for a non-criminal state of mind." Oppong submitted a declaration stating that he could have testified and "explained [his] thinking," contested whether "a number" of the signatures on the prescriptions were in fact his, and attested

to his "reliance on the decisions of" Rivera, Bryant, and Kusi. He added that former colleagues would have testified to his positive reputation before his involvement with HWMC.

Oppong did not submit affidavits from any colleagues as part of his motion, nor did he specify what his explanation would have been for his actions had he testified. Conners submitted a declaration stating that he had prepared Oppong adequately for trial, explained the pros and cons of Oppong's testifying in his own case, and investigated several witnesses whom Oppong had suggested. Conners concluded, with Oppong's alleged approval, that it was "not in [Oppong's] best interest to testify" and that the witnesses "were not likely to provide beneficial testimony."

The district court denied Oppong's motion for a new trial, calling the evidence that Conners's performance was deficient "slim" and holding that Oppong "has not demonstrated a reasonable probability that the results of the proceeding would have been different but for his attorney's alleged errors." He received his sentence, and this timely appeal followed.

II.

Federal Rule of Criminal Procedure 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review a district court's denial of a Rule 33 motion for a new trial for abuse of discretion. *United States v. Soto*, 794 F.3d 635, 645 (6th Cir. 2015). A district court abuses its discretion "when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014) (quoting *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007)). We review a claim for ineffective assistance of counsel de novo, however, as it presents mixed questions of law and fact. *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010).

5

Oppong's primary claim is that he received ineffective assistance from his trial counsel, Conners. Under *Strickland v. Washington*, 466 U.S. 668 (1984), an ineffective-assistance claim requires that Oppong show both deficiency and prejudice. *Id.* at 687. Deficiency means that counsel's performance "fell below an objective standard of reasonableness." *Id*. at 688. But *Strickland* sets out "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. To establish prejudice, Oppong must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Oppong's briefing is often unclear as to why he should receive a new trial, as he proffers little evidence to support most of his claims. Oppong first argues that Conners was constitutionally deficient under the Sixth Amendment by failing to call him to testify. In his declaration, Oppong claims that had he testified, his testimony could have "explained [his] thinking" as to his signing of the blank prescriptions. Yet Oppong has had ample opportunity to explain his thinking, and he has declined to do so. Neither his declaration to the district court nor any of his briefing to us explains his thinking. And when the Government pointed out this fact, Oppong again refused to explain himself. *See* R. 51, PID 1463 ("At this stage, Defendant is reluctant to indicate what the explanation is since it would give the Government information to which it is not entitled.").

Additionally, although Oppong suggests that he would have testified that some signatures on the prescriptions were not his, Oppong admits in his declaration that he signed some number of blank prescriptions, which reflects Conners's understanding as well. Given Oppong's statement that he signed blank prescriptions and Conners's belief that it would not be in Oppong's best interest to testify or for Oppong's suggested witnesses to testify, we cannot conclude on this record

that Conners's performance was objectively unreasonable. The district court did not err in rejecting Oppong's arguments.

Next, Oppong argues that, had Conners called Oppong's suggested witnesses, those witnesses could have testified to his "rationale and intent for signing blank prescription forms." But in his declaration, he only mentions calling character witnesses and witnesses who could discuss "the manner in which I typically conducted myself in the practice of medicine." And Conners stated that Oppong's suggested witnesses were already likely to be called by the government or were character witnesses that would not likely provide beneficial testimony. Oppong and Conners disagree about how much Conners investigated the witnesses that Oppong did propose, but Oppong has submitted no evidence suggesting that his desired witnesses could speak to the actual events that resulted in his conviction. On these affidavits, even taking them in the light most favorable to Oppong, we cannot say that Conners's performance fell below the required standard of reasonableness. *See Strickland*, 466 U.S. at 688.

Nothing in the record shows that Conners's performance prejudiced Oppong either. The district court found that "taking Oppong's allegations as true . . . Oppong cannot prevail in his motion for a new trial because he has not demonstrated a reasonable probability that the result of the proceeding would have been different but for his attorney's alleged errors." We agree. Oppong's evidence does not establish a reasonable probability that the result of his trial would have been different. So the district court did not err in rejecting his ineffective-assistance claim.

Oppong makes various other arguments to support his motion for a new trial. None has merit. First, he questions whether the "sole act of pre-signing prescriptions is health care fraud" and "violates criminal law." But Oppong signed multiple prescriptions for patients with whom he had not met on days when he had not met with them—and often when no medical professional had

7

met or would meet with them—and left the required information blank, in violation of federal and state law. Thus, whether the "sole act of pre-signing prescriptions" is health care fraud or a violation of criminal law cannot change the result of the proceeding, and we need not address it here.

Oppong next asserts, for the first time on appeal, that the district court erred in instructing the jury on the elements of the conspiracy-to-distribute-controlled-substances charge. At one point, the jury instructions explained that the government had to prove that "Oppong's act was not for a legitimate medical purpose in the course of his professional practice *or* was beyond the bounds of medical practice."[2] Oppong argues that the district court should have instructed the jury

---

[2] The district court's jury instructions listed the elements for each offense with which Oppong was charged. For the charge of conspiracy to illegally distribute controlled substances, the district court stated, among other things:

> Registered practitioners are exempt from criminal liability if they distribute or dispense controlled substances for a legitimate medical purpose while acting in the usual course of professional practice. In order to find the defendant guilty of a violation of [21 U.S.C. § 841(a)], the government must prove beyond a reasonable doubt each of the following elements.
>
> Number one, the defendant distributed or dispensed a controlled substance as alleged in Count 7 of the indictment.
>
> Number two, the defendant acted knowingly and intentionally in distributing or dispensing of a controlled substance; and number three, the defendant's act was not for a legitimate medical purpose in the course of his professional practice or was beyond the bounds of medical practice. . . .
>
> If a doctor dispenses a drug in good faith in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the course of medical practice. That is, he has dispensed the drug lawfully.
>
> Good faith in this context means good intentions in the honest exercise of best professional judgment as to a patient's need. It means the doctor acted in accordance with what he believed to be proper medical practice. If you find that the defendant acted in good faith in dispensing the drugs, then you must find him not guilty. . . .
>
> The term usual course of professional practice means that the practitioner has acted in accordance with the standard of medical practice generally recognized and accepted in the United States. A physician's own individual treatment methods do not, by themselves, establish what constitutes a usual course of professional practice. In making medical judgments concerning the appropriate treatment o[f] an individual, however, physicians have discretion to choose among a wide range of available options.

The text of § 841(a) does not explicitly require the government to prove that a physician-defendant dispensed controlled substances other than for a "legitimate medical purpose" in the "usual course of his professional practice," but regulations provide that a controlled substance may be dispensed by a prescription "issued for a legitimate medical purpose by an individual [registered] practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a); *see also id.* § 1306.03(a) (establishing that a practitioner dispensing controlled substances must be registered to do so or be exempt from registration).

that the government had to prove that Oppong's actions were for an "illegitimate medical purpose" *and* "not in the usual course of medical practice."[3]

Because Oppong did not object to the jury instructions at trial or argue in his motion for a new trial that the district court's jury charge was erroneous, we review the jury instructions for plain error. *See United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006). To establish plain error, a defendant must show "(1) an actual 'error or defect,' (2) that is 'clear or obvious,' (3) affecting his 'substantial rights,' (4) that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Clancy*, 979 F.3d 1135, 1140 (6th Cir. 2020) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). "A lack of binding case law" on the question presented will preclude a finding of clear or obvious error. *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015). "Plain error can occur at the time of a district court's decision and at the time of appellate review." *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013) (citing *Henderson v. United States*, 568 U.S. 266, 269 (2013)).

Binding precedent does not suggest that the district court erred as Oppong contends. In *United States v. Moore*, 423 U.S. 122 (1975), the Supreme Court held that "registered physicians can be prosecuted under [21 U.S.C.] § 841 when their activities fall outside the usual course of professional practice." *Id.* at 124. But the Supreme Court did not reach the issue raised by Oppong. *See generally id.* In *United States v. Kirk*, 584 F.2d 773 (6th Cir. 1978), we observed that "[i]t has been held that there is no difference in the meanings" of the phrases "in the usual course of

---

Regulations also provide that "[a] prescription may be prepared by the secretary or agent for the signature of a practitioner, but the prescribing practitioner is responsible in case the prescription does not conform in all essential respects to the law and regulations." *Id.* § 1306.05(f).

[3] We note that Oppong failed to identify this claim as a separate argument in the issues presented. But because this claim is clearly presented, we will address it.

professional practice" and "legitimate medical purpose."[4]  *Id.* at 784 (citing *United States v. Plesons*, 560 F.2d 890, 897 (8th Cir. 1977); *United States v. Rosenberg*, 515 F.2d 190, 197 (9th Cir. 1975)).

Other courts of appeals have inferred from *Moore*'s holding that a defendant-physician can be convicted under 21 U.S.C. § 841(a) without a separate showing that the defendant acted absent a "legitimate medical purpose." *See United States v. Armstrong*, 550 F.3d 382, 397 (5th Cir. 2008) (rejecting the defendant's argument that the district court erred by instructing the jury to apply a disjunctive standard), *overruled on other grounds by United States v. Guillermo Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010); *United States v. Nelson*, 383 F.3d 1227, 1232–33 (10th Cir. 2004) (same); *cf. United States v. Abovyan*, 988 F.3d 1288, 1305 (11th Cir. 2021) ("The rule is disjunctive, and a doctor violates the law if he falls short of either requirement.").

Still other courts of appeals seem to have suggested otherwise.  *See United States v. Smith*, 573 F.3d 639, 649 (8th Cir. 2009) (rejecting the argument that the definition of "usual course of professional practice" conflated the standard for criminal liability with the standard for medical malpractice in part because "the jury instructions on the whole required more than a finding that [the physician] did not adhere to generally accepted medical standards"; the instructions also required the government to prove that the defendant lacked a "legitimate medical purpose"); *United States v. Feingold*, 454 F.3d 1001, 1012 (9th Cir. 2006) (explaining that the jury instructions, which stated the elements at issue conjunctively, "correctly articulated" the standard for criminal liability under 21 U.S.C. § 841(a)).[5]  Either way, binding case law does not support

---

[4] In *Kirk*, we concluded that the evidence was sufficient for the jury to conclude that the defendant's issuance of prescriptions "was not in the usual course of professional practice or for a legitimate medical or research purpose," 584 F.2d at 785–86, but did not directly address the disjunctive/conjunctive issue.

[5] We note that the Supreme Court has granted certiorari in *Kahn v. United States*, No. 21-5261, in which one of the questions presented is: "Should the 'usual course of professional practice' and 'legitimate medical purposes'

Oppong's jury-instructions challenge. We find no plain error in the district court's jury instructions.

Oppong also argues that the evidence introduced at trial "may meet the threshold for medical malpractice but not [a] crime," and that mere "negligent prescriptions are insufficient for criminal liability" because the blank prescriptions "were for patients with legitimate medical needs." Not so. The standard the jury applied did not allow Oppong to be convicted on mere negligence. On the contrary, the jurors were to find Oppong not guilty if they believed he acted in good faith and were instructed that "good faith" means that "the doctor acted in accordance with what he believed to be proper medical practice." And Oppong was not convicted for simply writing "negligent prescriptions." He was convicted for his role in a complex health care fraud conspiracy that included his pre-signing of prescriptions and his signing of medical notes for patients whom he had not seen. *See, e.g.*, *United States v. Guzman*, 571 F. App'x 356, 363 (6th Cir. 2014) (finding a conspiracy "amply established" by evidence of use of pre-signed blank prescriptions and examinations that the physician did not perform).

To the extent that Oppong challenges other aspects of counsel's representation or the court's jury instructions in his attempt to fashion a meritorious claim, we reject those challenges as well. None of these other grounds suggest that the district court abused its discretion.

III.

Oppong presented slim evidence at best that Conners's performance at trial was constitutionally deficient. And Oppong cannot show that his testimony and his proposed witnesses' testimony would have changed the outcome of the trial. His other claims have no merit.

---

prongs of [21] C.F.R. § 1306.04(a) be read in the conjunctive or the disjunctive?" *See* Brief for Petitioner at 1, *Kahn v. United States* (No. 21-5261), 2021 WL 6118301, at *1 (July 26, 2021).

For these reasons, the district court's denial of Oppong's motion for a new trial was not an abuse of its discretion. We affirm.